THOMPSON, Judge.
J.H.F. (“the father”) sued P.S.F. (“the mother”) for a divorce, seeking, among other things, custody of the parties’ children. The mother answered, denying the material allegations in the father’s complaint. The father later amended his complaint to allege that the mother had committed adultery. The trial court conducted a hearing and received ore tenus evidence.
On January 5, 2001, the trial court entered a judgment divorcing the parties and awarding the parties joint legal custody of the children, with the mother having primary physical custody. The judgment also divided the parties’ marital property. In addition, the trial court ordered the father to pay $580 per month in child support and specified that the father’s child-support obligation would automatically increase beginning in July 2001. Both parties filed postjudgment motions. On March 21, 2001, the trial court entered a postjudgment order in which, among other things, it eliminated the provision in its divorce judgment that had ordered the automatic increase in the father’s child-support obligation. The mother filed a second postjudgment motion on April 20, 2001; in that motion, she argued that the trial court had erred in eliminating the automatic increase in child support. The mother’s April 20, 2001, postjudgment motion worked to extend the time for taking an appeal from the trial court’s judgment. Ex parte Dowling, 477 So.2d 400 (Ala.1985) (where a trial court grants a party’s postjudgment motion and modifies its judgment, the party newly aggrieved by that modified judgment may file a successive postjudgment motion); Woodall v. Woodall, 506 So.2d 1005, 1007 (Ala.Civ.App.1987) (“In situations where a judge has granted a postjudgment motion for one party, the nonmoving party aggrieved by the motion has the right under our rules to file his or her own postjudgment motions.”).
On April 27, 2001, the father appealed to this court. We note, however, that at the time the father filed his notice of appeal, the judgment of the trial court was not yet final; therefore, the father’s appeal was deemed to be held in abeyance until such time as the trial court entered a final judgment or the mother’s April 20, 2001, postjudgment motion was denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P., whichever first occurred. See Rule 4(a)(5), Ala. R.App. P.
On April 30, 2001, the trial court entered an order pursuant to the mother’s April 20, 2001, postjudgment motion. In its April 30, 2001, postjudgment order, the trial court required the parties to submit new child-support income affidavit forms in order for it to recalculate the father’s child-support obligation pursuant to the Rule 32, Ala. R. Jud. Admin., Child Support Guidelines. The trial court’s April 30, 2001, order stated, in part, that “[i]f the [Rule 32 Child Support Guidelines] support an adjustment, it will be made without further hearing.”
The parties submitted new CS-41 forms, and on June 21, 2001, the trial court entered an order decreasing the father’s child-support obligation to $360 per month. On July 17, 2001, the mother filed yet another postjudgment motion; because the June 21, 2001, order had further decreased the father’s child-support obligation, the mother’s July 17, 2001, postjudgment motion also worked to extend the time for taking an appeal. See Ex parte Dowling, supra; Woodall v. Woodall, supra. In the July 17, 2001, motion, the mother argued *1027 that the trial court had erred in its calculation of the father’s child-support obligation. On August 21, 2001, this court entered an order formally stating that the father’s appeal was being held in abeyance pending the trial court’s ruling on the pending postjudgment motion.
On August 23, 2001, the trial court entered an order denying the mother’s July 17, 2001, postjudgment motion; that order constituted a final judgment — it finally determined the rights and liabilities of the parties. See Bean v. Craig, 557 So.2d 1249, 1253 (Ala.1990). The father’s notice of appeal is deemed to have been filed on August 23, 2001, the date the trial court entered that final judgment. Rule 4(a)(5), Ala. R.App. P. The mother timely appealed on September 17, 2001. See Rule 4(a)(2), Ala. R.App. P.
The record indicates that the parties were married on August 2, 1986. The parties’ twin sons were born in 1992. During their “separation,” the parties continued to live together in the marital residence; they each had the responsibility for taking care of their children on alternate days.
The mother has a college degree. The mother did not work outside the home for the first few years of the children’s lives, but she returned to the workforce in 1995 and was employed as a secretary. In February 1999, the mother was hired to work as the secretary of her church; she received a salary of $28,600 per year. It is undisputed that the mother had an affair with a minister at her church; as a result, in the late spring of 2000, the mother lost her job with the church. At the time of the trial in this matter, the mother worked part-time, earning $8 per hour. The income affidavit the mother filed in compliance with the trial court’s April 30, 2001, postjudgment order indicated that she had a new job at which she earned approximately $27,500 per year.
The father works as a real-estate appraiser. The father testified at the trial that his income had decreased because his employer’s business had suffered a decline. The father testified that he had received an offer of employment for a job that would pay a higher salary, but that job would require him to move to Baldwin County. It is undisputed that the mother did not want to move to Baldwin County and that, because of the mother’s objection, the father had not taken the job at the time of the trial. However, the father testified at the trial that the job was still available to him and that he planned to accept the job and move to Baldwin County. The father testified that when he moved to Baldwin County, he expected to receive a total annual income of $62,000.
The father testified that he wanted custody of the parties’ children; he testified that he believed the children should move with him to Baldwin County in part because he believed that it was less likely that they would learn of the mother’s affair if they did not live in Montgomery County. The father testified regarding the various activities, such as fishing, woodworking, and soccer, in which he and the children participate. The father presented evidence indicating that he had purchased a house in Baldwin County and that he had friends there who would help him take care of the children. The father’s father and the father’s grandfather reside in Baldwin County. The father’s mother resides in Montgomery County.
The mother testified that she has been the children’s primary caretaker since they were born and that she is active in the children’s lives. She testified that it was only when the parties separated that the father began taking an active role in the daily routine of caring for the children. The mother’s extended family lives in Montgomery County. The mother testi *1028 fied that she did not believe the children should be removed from their home and family in Montgomery.
The father testified that the mother could not maintain discipline over the parties’ children. The mother and several other witnesses testified that the father was often harsh with the children and that he “barked” orders at them.
Much of the evidence at the trial focused on each party’s allegations that the other party had caused the breakdown of the marriage. No purpose would be served by a lengthy recitation of that evidence; therefore, this court sets forth only a brief summary of those facts.
Each party accused the other of drinking to excess, and each party denied the other’s allegation. Much of the evidence at the trial focused on the mother’s affair with the family’s minister. The mother admitted to the affair, but she testified that the affair had not caused the breakdown of the parties’ marriage. The mother testified that the parties’ marriage had been tumultuous. She presented evidence that the father verbally abused her and that he was overly critical of her. The mother testified that the parties had begun discussing the possibility of obtaining a divorce before she began the affair.
The father testified that he and the mother were incompatible. The father denied making derogatory remarks about the mother. The father testified that he learned of the mother’s affair with the minister in late July 2000, approximately one month after he filed his complaint seeking a divorce.
The mother presented no evidence regarding the value of the parties’ marital assets. Therefore, the father’s testimony and evidence regarding that issue are undisputed. The parties’ marital home was valued at $103,000. The father had obtained a $95,000 unsecured loan to purchase that home; he asked the trial court to award the marital home to the mother but to require her to obtain financing to convert the unsecured loan into a mortgage on the home. The father presented evidence indicating that the parties own a van worth $6,000 and that he has a truck with a total equity of $10,000. The mother had $4,985 in two separate retirement accounts; the father’s 401(k) plan had a value of $15,696. At the time of the trial in this matter, the father also had a checking account with a $400 balance.
The father and the mother’s brother were joint owners of J&M, L.L.C., which owns several parcels of rental property. The father’s equity interest in the rental property in that limited liability company totaled $31,412 at the time of the trial. In addition, the father and the mother owned an undivided one-third interest in F&C, L.L.C., a business created by the father’s family; that company also owns rental property. The father valued the parties’ one-third interest in F&C, L.L.C., at $18,338.
During their marriage, the parties incurred various credit-card debts; the parties’ credit-card indebtedness totaled $9,681. The parties also had an equity line of credit. The father testified that the parties had paid the outstanding balance on the equity-line of credit in late spring 2000. However, the father testified that while this case was pending, he had borrowed on that line of credit and that, at the time of the trial, he owed a balance of $5,571. The father testified that he also owed his mother a total of $21,000 for various amounts of money she had provided the parties over the course of their marriage. Upon questioning by the trial judge, however, the father admitted that he had no documentation to support his claim regarding that indebtedness to his mother.
*1029 In its divorce judgment, the trial court awarded the mother the parties’ marital home, subject to her obtaining a mortgage for the amount of the unsecured loan the father had obtained in his own name in order to purchase the house; the mother was to be solely responsible for the payments on that mortgage indebtedness. In addition, the trial court awarded the mother the van she regularly drove, the retirement accounts in her name, and the father’s interest in J&M, L.L.C. The trial court ordered the mother to be responsible for $700 of the marital debt.
The trial court awarded the father his truck, his 401 (k) retirement account, the funds in his checking account, and the parties’ one-third interest in F&C, L.L.C. The trial court ordered the father to pay $14,572 of the marital debt. The divorce judgment also provided that each party was responsible for the indebtedness owed to their respective family members.
On appeal, the father argues that the trial court erred in awarding primary physical custody of the parties’ children to the mother. In an initial custody determination, the parties stand on equal footing; no presumption inures in favor of either parent’s receiving custody of the children. Smith v. Smith, 727 So.2d 113 (Ala.Civ.App.1998). In making its initial award of custody, the trial court applies the best-interests-of-the-child standard. Ex parte Couch, 521 So.2d 987 (Ala.1988). The trial court must consider factors such as the children’s ages and each parent’s ability to provide for the emotional, social, moral, material, and educational needs of the children. Roberts v. Roberts, 802 So.2d 230, 233 (Ala.Civ.App.2001). The court may also consider other factors, such as the characteristics of each parent, including his or her age, character, stability, and health, as well as each parent’s relationship with the children. Id.; Smith v. Smith, supra. The trial court may consider a parent’s adultery in determining custody; however, “acts of adultery do not bar an award of custody” to the party who committed adultery. Etheridge v. Etheridge, 375 So.2d 474, 475 (Ala.Civ.App.1979). Rather, in order to deprive a parent of custody because of his or her act of adultery, there must be evidence that the adultery had a “direct bearing upon the welfare of [the] children.” Hearold v. Hearold, 620 So.2d 48, 49 (Ala.Civ.App.1993).
As part of his argument that the trial court erred in its custody determination, the father argues that the mother committed domestic violence against him and that, therefore, there is a presumption against awarding custody to her. See § 30-3-131, Ala.Code 1975. The evidence the father cites in this part of his argument indicates that the mother hit the father in the shoulder on two occasions when the parties were arguing; the father testified that the mother did not hurt or injure him. The trial court made no finding that those acts constituted domestic abuse under the Custody and Domestic or Family Abuse Act, §§ 30-3-130 through-136, Ala.Code 1975. This court may assume that the trial court made the findings necessary to support its judgment, i.e., this court may assume that the trial court found either that the acts did not occur or that the acts did not constitute domestic abuse. Ex parte Farm, 810 So.2d 631 (Ala.2001). Our review of the evidence in the record on appeal supports such a determination.
The record indicates that both parties love the children and that both parties have been active participants in the children’s lives. Although the father argues the mother’s adultery negatively impacted her ability to parent the children, the trial court specifically addressed that issue in its judgment:
*1030 “[E]ither party is able equally to meet the basic needs of the children. In making an award of primary physical custody to [the mother], [the Court] is motivated mostly by a reluctance to add to the disruption of a move to Baldwin County the disruption [caused by] the loss of a two-parent home.... The Court is satisfied that [the father] is close to his boys, that he has been an active participant in their school and extracurricular activities, but the same is true of [the mother]. And, all of [the mother’s family, including] the children’s grandfather, aunts and uncle, cousins, and even [the father’s] mother are here. Only [the father’s] father and grandfather are in the Baldwin County area.
“The Court in no way excuses or minimizes [the mother’s] infidelity, nor does it believe that she looks upon it lightly.... Yet, the Court sees no evidence of such widespread promiscuity as would adversely affect [the mother’s] role as mother and chief caregiver for the children. Simply put, it will be better for the children to remain in Montgomery County with their mother than to move to Baldwin County with their father.”
Those findings of fact clearly indicate that in making its initial custody determination, the trial court properly considered the factors set forth in Roberts v. Roberts, supra, and Smith v. Smith, supra. The trial court also considered the possible impact of the mother’s adultery on the children and determined that it had not had a detrimental effect on the children. After carefully reviewing the evidence in the record on appeal, we conclude that the evidence supports the trial court’s findings of fact. The record would support an award of custody to either party. Given the trial court’s specific findings of fact regarding the issue of custody, we cannot say that it abused its discretion in awarding primary physical custody of the children to the mother.
The father also argues that the trial court erred in fashioning its property division. A property division is required to be equitable, but not necessarily equal. Willing v. Willing, 655 So.2d 1064 (Ala.Civ.App.1995). In dividing the parties’ marital property, the trial court should consider
“ ‘the ages and health of the parties, the length of their marriage, their station in life and their future prospects, their standard of living and each party’s potential for maintaining that standard after the divorce, the value and type of property they own, and the source of their common property.’ ”
Brown v. Brown, 719 So.2d 228, 231 (Ala.Civ.App.1998) (quoting Covington v. Covington, 675 So.2d 436, 438 (Ala.Civ.App.1996)). “[T]he award or division [of marital property] need only be equitable and be supported by the particular facts of the case.” Ex parte Elliott, 782 So.2d 308, 311 (Ala.2000).
The father argues that the trial court awarded a disproportionate amount of marital property to the mother. The parties were married for approximately 14 years. Neither party testified regarding his or her health, but it is clear that both parties are capable of full-time employment. The mother has, over the years preceding the parties’ divorce, earned approximately $28,000 per year. The father testified that upon his move to Baldwin County, he expected to earn annual income of $62,000. Although the mother had had an extramarital affair, the record supports a conclusion that that fact alone did not cause the breakdown of the parties’ marriage. The mother presented evidence indicating that the father was verbally abusive and overly critical of her.
Our review of the record indicates that the trial court awarded the mother equity in marital assets totaling $145,397, less *1031 $98,200 in indebtedness on those assets, for a total equity amount of $47,197. The trial court awarded the father a total of $44,434 in marital assets, less indebtedness of $14,572. The father claims in his brief on appeal that he is required to repay the indebtedness to his mother. However, the father presented no evidence regarding that indebtedness or regarding whether he was required to repay his mother for the amounts she had provided the parties during their marriage.
The trial court awarded each party the vehicle he or she normally drove. It also awarded the parties’ primary marital asset, the marital home, to the mother; we note that that award enabled the mother and the parties’ children to remain in their home. The mother is solely responsible for making the mortgage payments on the marital home. Although the father was ordered to pay the vast majority of the other marital indebtedness, the father testified that he expected to earn income totaling more than twice the amount earned by the mother. The property distribution favors the mother. We note, however, that the trial court awarded each party the interests in the limited liability company in which his or her family was involved. Were we making the initial property distribution, this court might not have made the same property distribution as did the trial court. However, “the appellate court is ‘simply to determine if there was sufficient evidence before the [trial] court to support its decision against a charge of arbitrariness and abuse of discretion.’ ” Ex parte Elliott, 782 So.2d at 311 (quoting Ex parte Smith, 673 So.2d 420, 422 (Ala.1995)). Given the particular facts of this ease, we cannot say that the trial court’s property division was plainly and palpably wrong. See Ex parte Elliott, supra.
We next address the issue the mother raises in her cross-appeal. In its January 5, 2001, divorce judgment, the trial court ordered the father to pay $580 per month in child support, and it provided that the father’s child-support obligation would automatically increase to $1,040 per month in July 2001. In its March 21, 2001, postjudgment order, the trial court set aside the part of its judgment providing for an automatic increase in the father’s child-support obligation; the trial court specifically found that “[o]n review, it probably is better not to assume that circumstances will change by then.” See Morrison v. Kirkland, 567 So.2d 363, 364 (Ala.Civ.App.1990) (“The trial court may not speculate on a future ability or need.”). The mother filed another postjudgment motion and requested a hearing on that motion. In response, on April 30, 2001, the trial court required the parties to submit new CS-41 income affidavits. Both parties did so. Based on those income affidavits and the Rule 32, Ala. R. Jud. Admin., Child Support Guidelines, but without conducting a hearing, on June 21, 2001, the trial court reduced the father’s child-support obligation to $360 per month. The wife filed another postjudgment motion, again requesting a hearing, and the trial court denied that motion. The wife argues that the trial court’s June 21, 2001, postjudgment order impermissibly reduced the father’s child-support obligation without affording her a hearing.
A trial court commits error when it fails to conduct a hearing requested by a party on a Rule 59, Ala. R. Civ. P., postjudgment motion. Kitchens v. Maye, 623 So.2d 1082 (Ala.1993). However, that error is not necessarily reversible error. Id. *1032 substantial rights of the parties.’ See Greene [v. Thompson,] 554 So.2d [376,] 380-81 [ (Ala.1989) ]; Walls [v. Bank of Prattville,] 554 So.2d [381,] 382 [(Ala.1989) ]. In Greene v. Thompson, supra, [our supreme court] formulated a test to determine when the denial of a Rule 59(g) request for a hearing is harmless error:
*1031 “Under Rule 45, Ala. R.App. P., the failure to grant a hearing on a motion for new trial pursuant to Rule 59(g) [, Ala. R. Civ. P.,] is reversible error only if it ‘probably injuriously affected
*1032 “ ‘Harmless error occurs, within the context of a Rule 59(g) motion, where there is either no probable merit in the grounds asserted in the motion, or where the appellate court resolves the issues presented therein, as a matter of law, adversely to the movant, by application of the same objective standard of review as that applied in the trial court.’
“554 So.2d at 381.”
Kitchens v. Maye, 623 So.2d at 1088-89 (footnote omitted).
We recognize that a trial court may in certain instances consider new evidence submitted in support of a motion made pursuant to Rule 59, Ala. R. Civ. P. See Ex parte Johnson, 673 So.2d 410 (Ala.1994) (a party may, but is not required to, submit additional evidence in support of a Rule 59, Ala. R. Civ. P., postjudgment motion); McGriff v. Owen, 791 So.2d 961 (Ala.Civ.App.2000) (affirming the trial court’s refusal to take additional evidence where the evidence would be merely cumulative). In this case, the evidence was not cumulative, but represented a departure from that evidence presented at the trial. The mother argues that she was not given an opportunity to cross-examine the father regarding the newly submitted evidence, which indicated that his income had decreased since the time of the trial of this matter. The mother also contends that the evidence could support a finding that the father is voluntarily underemployed, and, therefore, that income should be attributed to the father for the purpose of calculating his child-support obligation. See Rule 32(B)(5), Ala. R. Jud. Admin.
The trial court based its $200 per month reduction in the father’s child-support obligation solely on the new evidence the father presented in his income affidavit; it did not afford the mother an opportunity to dispute that evidence. We find that the trial court should have conducted a hearing. See Martin v. Martin, 637 So.2d 901, 903 (Ala.Civ.App.1994) (“[I]f one party’s statement of income form is disputed by the other party, then that issue can be resolved by competent evidence at the trial court level.”) Given the particular facts of this case, we cannot conclude that the trial court’s failure to conduct the requested Rule 59, Ala. R. Civ. P., hearing before altering the father’s child-support obligation based on new evidence was harmless error. Therefore, we must reverse as to this issue.
The appellant’s request for an attorney fee is denied.
AFFIRMED AS TO THE APPEAL; REVERSED AND REMANDED AS TO THE CROSS-APPEAL.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.