PER CURIAM.
Kelli Faith Grocholski (“the wife”) appeals the Fayette Circuit Court’s judgment divorcing her from William Allen Grochol-ski (“the husband”) and dividing the parties’ marital estate. We affirm in part and reverse in part.
The parties were married on August 17, 1988. The parties have two children. The older child was born of the wife’s previous marriage, and the husband adopted him; the younger child was born of the parties’ marriage. Both of the children were adults at the time of the trial. Therefore, the only issue tried before the trial court was the division of marital assets and debts.
The parties separated in January 2007, and the husband filed a complaint for a divorce on July 30, 2008. The trial court conducted a bench trial over the course of two days in March 2010, at which ore tenus and documentary evidence were presented. That evidence tended to show the following pertinent facts.
The husband, who was 63 years old at the time of the trial, owned and operated his own law practice in Fayette; the husband had worked as an attorney throughout the course of the parties’ marriage. The husband testified that his income for 2008 had been $65,949 and that his income for 2009 had been $39,043. The wife dis *126 puted the husband’s testimony concerning the husband’s income, indicating that, “on a bad year, a slow year, [the husband] probably made [$]200,000.” Her opinion as to the husband’s income was based largely on the parties’ lifestyle.
The husband’s “Social Security Statement,” dated June 19, 2009, was submitted into evidence. That document indicated that the husband’s average “taxed Medicare earnings” from 1997 to 2007 was approximately $33,000. However, both parties agreed that the husband had more income than was reflected in that document. Furthermore, both parties testified that the husband was paid in cash for some of the legal work he performed. The husband testified that he “didn’t do as good a job as [he] probably should have, but [that he] did a better job than [he had] done in the past,” of keeping up with the amount of cash that was coming into his law firm. The husband also admitted that there probably had been some inaccuracies in his past tax returns.
Other than occasionally working for the husband’s law practice, the wife, who was 44 years old at the time of the trial, had not worked outside of the home during the course of the parties’ marriage. The wife testified that the husband had not wanted her to work outside of the home and that she had honored that request. During the course of the parties’ marriage, the wife had obtained a college education and a master’s degree from the University of Alabama. The wife’s deposition testimony, some of which was read at trial, indicated that because of a herniated disk her standing and lifting abilities are impaired but that she believed she could be employed so long as the employment did not require her to stand for long periods or to lift too much. However, at trial, the wife testified that she had been “sedated” during her deposition. The wife testified that she had not searched for employment during the parties’ separation because she had spent significant amounts of her time receiving “pain shots” and “trigger points” and attending physical therapy. The wife testified that she had “a lot of lower back pain,” “some upper back pain,” “a lot of leg cramps,” “a lot of bladder issues,” migraine headaches, and “just a lot of pelvic issues, chronic pelvic issues that cause[ ] a lot of great pain.” The wife testified that she was receiving treatment for each of the above-listed ailments. The husband testified that he thought that the wife could work; however, he testified that she could not stand for long periods.
It is undisputed that the parties owned a substantial amount of real and personal property, including multiple parcels of land, retirement and brokerage accounts, and certificates of deposit worth approximately $350,000. At the time of the trial, the parties owned a 2002 Toyota Sequoia sport-utility vehicle, a 1997 Mercedes Benz E320 automobile, a 2000 Ford F-150 pickup truck, a 1978 Chevrolet Corvette automobile, a 2000 Chevrolet 1500 pickup truck, a 1997 Ford F-150 pickup truck, and a 1978 GMC pickup truck. The parties also owned a Sea-Doo personal watercraft, a John Deere 950 tractor, a 1998 EGO golf cart, a 16-foot 1978 VIP powerboat along with a boat trailer, and a “pull-behind” trailer. In addition, the wife owned jewelry, five pieces of which had a combined “estimated replacement value” of $88,500. The parties apparently acquired all the above-mentioned property, whether real or personal, either through inheritance or by paying cash. The parties had no debt associated with any of the property.
The parties were members of the Fay-ette County Country Club, where they owned a “golf shed.” The husband testified that the parties would take one vaca *127 tion annually; the wife testified that the parties would take multiple vacations annually. The parties also were members of a booster club associated with University of Alabama athletics that permitted them to purchase four sets of season tickets to University of Alabama football games.
Although the parties had no debt at the time they separated, both of them incurred debt during the pendency of the divorce proceeding. The husband testified that, since filing for divorce from the wife, he had incurred $64,785.89 in “bank debt” at Citizens Bank of Fayette. Further, Fowler Oil Company billed the husband $2,799.74 for gasoline charges. The husband testified that he had opened an account with Fowler Oil Company so that the wife and one of his sons could purchase gasoline during the parties’ separation. The parties had also incurred $4,684.63 in charges at a pharmacy.
From the time that the husband filed for a divorce to the time of trial, the wife had borrowed $86,000. She testified that she had used the borrowed funds to pay for living expenses and attorney’s fees. The wife also testified that she had charged to a credit card approximately $1,000 for medical co-pays since the husband had filed for a divorce.
The husband testified that from the time the parties separated until he filed for a divorce, the wife had used a credit card for her monthly expenses. The husband testified that the monthly charges for the wife’s credit card were approximately $1,000, which he paid. The husband also testified that he had given the wife approximately $200 in cash per week. The wife introduced a budget at trial indicating that her monthly expenses were $7,379.91; the wife testified extensively as to how she arrived at that amount. She stated that she was requesting an award of at least $5,000 per month as alimony.
The parties’ younger child was enrolled in college, and the husband had been paying for his tuition and agreed to continue to do so. The husband also indicated that he would pay for the child’s health insurance while he was enrolled in college.
The trial court entered a divorce judgment on May 3, 2010. Among other things, the trial court divided the marital assets in a manner slightly favoring the wife, and it ordered the husband to pay the wife $1,500 per month in periodic alimony. The trial court ordered the husband to pay the debt incurred in his name that was owed to Citizens Bank and the debt to Fowler Oil, and it ordered the wife to pay the 86,000 debt she had incurred since the parties’ separation, as well as the debt owed to the pharmacy. The trial court also ordered the husband to pay for all the parties’ youngest son’s college expenses and to pay $10,000 toward the wife’s attorney’s fees. The wife appeals.
The standard by which this court reviews a judgment following an ore tenus proceeding is well settled.
“ ‘When ore tenus evidence is presented, a presumption of correctness exists as to the trial court’s findings on issues of fact; its judgment based on these findings of fact will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. J & M Bail Bonding Co. v. Hayes, 748 So.2d 198 (Ala.1999); Gaston v. Ames, 514 So.2d 877 (Ala.1987).... However, when the trial court improperly applies the law to [the] facts, no presumption of correctness exists as to the trial court’s judgment. Allstate Ins. Co. v. Skelton, 675 So.2d 377 (Ala.1996); Marvin’s, Inc. v. Robertson, 608 So.2d 391 (Ala.1992); Gaston, 514 So.2d at 878; Smith v. Style Advertising, Inc., 470 So.2d 1194 (Ala.1985); League v. *128 McDonald, 355 So.2d 695 (Ala.1978). “Questions of law are not subject to the ore tenus standard of review.” Reed v. Board of Trustees for Alabama State Univ., 778 So.2d 791, 793 n. 2 (Ala.2000). A trial court’s conclusions on legal issues carry no presumption of correctness on appeal. Ex parte Cash, 624 So.2d 576, 577 (Ala.1993). This court reviews the application of law to facts de novo. Allstate, 675 So.2d at 379 (“[Wjhere the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the [trial] court’s judgment carries no presumption of correctness.”).’ ”
Farmers Ins. Co. v. Price-Williams Assoc., Inc., 873 So.2d 252, 254-55 (Ala.Civ.App.2003). (quoting City of Prattville v. Post, 831 So.2d 622, 627-28 (Ala.Civ.App.2002)).
The wife first argues that the trial court erred in not'allowing her to discover the husband’s cellular-telephone records. “Discovery matters are within the trial court’s sound discretion, and this Court will not reverse a trial court’s ruling on a discovery issue unless the trial court has clearly exceeded its discretion.” Ex parte Ocwen Fed. Bank, FSB, 872 So.2d 810, 813 (Ala.2003) (citing Home Ins. Co. v. Rice, 585 So.2d 859, 862 (Ala.1991)).
In December 2008, the wife filed a notice of intent to serve a third-party subpoena on the husband’s cellular-telephone carrier. The husband objected to the issuance of the third-party subpoena on the basis that some of the cellular-telephone records were subject to attorney-client privilege. On February 19, 2009, the trial court entered an order allowing the third-party subpoena to be issued to the husband’s cellular-telephone carrier; however, the trial court ordered that the cellular-telephone records be delivered directly to the trial court so that the husband’s counsel could review the records and identify any parts of the records that the husband contended were covered by attorney-client privilege. The husband’s cellular-telephone records were not delivered to the trial court until the day before trial — more than one year after the trial court ordered that the subpoena could be issued. At the trial, the trial court declined to allow the wife to discover the cellular-telephone records because, the trial court stated, of the lack of time for the husband’s counsel to review the records and because the telephone records were not relevant to any issues in the case.
Alabama recognizes a broad right of discovery. “Discovery should be permitted if there is any likelihood that the information sought will aid the party seeking discovery in the pursuit of his claim or defense. Discovery is not limited to matters that would be admissible as evidence in the trial of the lawsuit.” Ex parte AMI West Alabama Gen. Hosp., 582 So.2d 484, 485 (Ala.1991). The wife argues that the telephone records were relevant to whether the husband had committed adultery and that adultery was an issue in the case. However, the only reference to adultery in the wife’s filings or testimony was a single question in a set of interrogatories. The wife did not offer any testimony at trial relating to any alleged adultery of the husband or to any names or telephone numbers of alleged paramours. Thus, as the trial court determined, adultery by the husband does not appear to have been an issue in the case. Because the wife did not assert any claims of adultery by the husband, and because the wife did not provide any testimony relating to the issue of adultery by the husband, we cannot conclude that the trial court erred when it determined that the cellular-telephone records were not relevant to the issues in the case *129 and, accordingly, declined to allow the wife to discover the husband’s cellular-telephone records.
The wife next argues that the trial court’s award of periodic alimony was insufficient. The wife also argues that the trial court erred in its allocation of the parties’ debt.
“An award of alimony and the division of marital property are considered together and are matters within the discretion of the trial court. Carter v. Carter, 934 So.2d 406 (Ala.Civ.App.2005) (citing Ex parte Durbin, 818 So.2d 404, 408 (Ala.2001)). Because those matters are interrelated, the entire judgment must be considered in determining whether the trial court exceeded its discretion as to either issue. See [Harmon v.] Harmon, [928 So.2d 295 (Ala.Civ.App.2005)]. Furthermore, a property division does not have to be equal, but it must be equitable, J.H.F. v. P.S.F., 835 So.2d 1024 (Ala.Civ.App.2002), and it must be ‘supported by the particular facts of the case,’ Ex parte Elliott, 782 So.2d 308, 311 (Ala.2000). The determination of what is equitable is a matter of discretion for the trial court. See Carter, supra.”
Clements v. Clements, 990 So.2d 383, 390 (Ala.Civ.App.2007). The trial court should consider several factors when determining a party’s need for alimony and when dividing marital property, including “ ‘the length of the marriage, the age and health of the parties, the future employment prospects of the parties, the source, value, and type of property owned, and the standard of living to which the parties have become accustomed during the marriage.’ ” Ex parte Elliott, 782 So.2d 308, 311 (Ala.2000) (quoting Nowell v. Nowell, 474 So.2d 1128, 1129 (Ala.Civ.App.1985)).
With respect to its award of periodic alimony, the trial court stated in its judgment:
“At trial, the Husband was 63 and the Wife was 44. The Wife described various health conditions that she stated interfered with her ability to become employed, but the evidence shows that she is highly educated and intelligent and can reasonably be expected to obtain gainful employment in the future. She did not work during most of the marriage, however, and periodic alimony is due to be awarded. In view of the factors listed in this order as well as other factors established by the evidence (including but not limited to the income analysis as previously noted), the Husband shall pay the sum of one thousand five hundred dollars ($1,500) in periodic alimony to the Wife each month, with each payment due by the 5th day of each month. While this is substantially less than the $5,000 to $7,000 the Wife sought, it is the appropriate amount supported by the evidence presented in view of the income evidence.”
The trial court’s analysis of the parties’ income appeared earlier in its judgment. In that part of the judgment, the trial court stated:
“Through most of the marriage, the parties appear to have enjoyed a relatively affluent lifestyle. The only identified substantive source of income was from the Husband’s law practice. The evidence at trial established that the practice has operated principally in cash in both receipts and expenditures with the Wife’s knowledge and consent. Throughout the marriage, the Husband routinely left cash at his law office for the Wife to pick up and spend. The Husband testified he rarely bills clients for services, does not necessarily maintain receipts, engages in limited book *130 keeping activity, and could not estimate how much cash was taken in on an annual basis. At trial, the Wife guessed at the amount of money she thinks the Husband made based on the lifestyle they led; however, the court cannot make an award of alimony or other division based on speculation and conjecture. The joint tax return of the parties (acknowledged and adopted by the Wife during the marriage) contradicts the assertion that more money was received. An analysis of the Wife’s Trial Exhibit 1 and other exhibits showed that the Husband’s reported average annual income for the years 1997-2009 (a 13-year period) was approximately $34,000. This included a year (2004), however, where his reported income was several times greater than prior or subsequent years. Excluding 2004 (which could be considered an outlier), the reported income averaged approximately $26,000. Further, these amounts include substantial interest income each year from the investments that are being divided by this order. Therefore, the income reported by the parties cannot be reconciled with the Wife’s guesses about the actual income, nor can the amounts justify the expenses being claimed by the Wife.
“The Husband testified that the economic climate in the location where he practices had drastically changed for the worse in the recent years. It is known that the recession has caused significant decreases in income for many attorneys, causing many to close their practices. The Husband further testified that his income was greater when he was able to obtain personal injury cases in prior years. The Husband testified that those cases were not coming into his office based on advertising from other firms. The explanation given by the Husband about the decrease in income was supported by the evidence. Further, the Husband was 63 at the time of trial. Case law establishes that the court cannot make a spouse work more than he or she likely would have worked had the parties stayed married. The evidence does not establish that the Husband voluntarily reduced his income to avoid paying alimony or for purposes related to the divorce.”
The wife argues that the trial court’s finding of fact with regard to the husband’s income was not supported by the evidence. As quoted above, the trial court, relying on trial exhibits including the husband’s Social Security statement, found that the husband’s average annual income for the 13 years preceding the divorce was approximately $34,000. It is apparent from our review that the trial court, in arriving at that figure, added the amounts listed in the husband’s Social Security statement for the years 1997 to 2007 to the husband’s adjusted gross income as reflected in his federal income-tax returns for 2008 and 2009 and divided that number by 13. The problem with that approach is that the husband himself testified that the amounts contained in his Social Security statement were not an accurate reflection of his true income during those years, as shown by the following exchange at trial:
“Q. [Attorney for the wife:] I’m going to show you what I have marked as Defendant’s Exhibit 1. Can you identify that document for me?
“A. It says, Tour Social Security Statement,’ ‘June 19th, 2009.’
“Q. All right. And whose Social Security statement does that indicate that it’s for?
“A. William A. Grocholski.
“Q. And is that you?
“A. Well, I have a son William A., but I assume it’s mine. Yes, sir.
[[Image here]]
*131 “Q. And this is a list of your income from 1962 to 2007; is that correct?
“A. I don’t understand Social Security—
“[Attorney for the husband]: Object to form. Your Honor.
“THE COURT: On the basis of—
“[Attorney for the husband]: He asked if that was his taxable income. Or how exactly did you phrase it?
“[Attorney for the wife]: If this is his income for taxed Social Security earnings.
“[Attorney for the husband]: Okay. It’s your taxed Social Security earnings or your taxed Medicare earnings. It wouldn’t be all earnings.
“[Attorney for the wife]: Right.
“A. I don’t understand these records. I don’t understand Social Security procedures. For instance, in — when I was 15 years old in 1962,1 don’t think I filed an income tax return. Then there are periods of time I see here — I don’t— these can’t be my incomes, because there were periods when I made more than that. There are — I know when I’d get a check — again, I don’t understand the process. When I’d get a check through the office when I was with a partner, I’d get a weekly draw and a— had a FICA [ (Federal Insurance Contributions Act) ]. And I think that’s what this is, maybe, whatever FICA— anyway, and a federal and a state deduction. But then we would do a disbursement for, let’s say — I think she presented in one of her responses we had a $300,000 case. Well, all we got on that was a 1099. I didn’t get any FICA taken out of it and I didn’t get any Social Security or state and federal taxes out of it. So I don’t know how that would work into this operation. But I don’t think it would be reflected in here.
“Q. Okay.
“A. Now, I don’t know, but that’s my understanding.
“Q. Okay. So your income would be greater than what’s reflected in the Social Security statement?
“A. That’s my understanding of it. Again, I’m not a Social Security expert. But I know that some of these don’t appear to be the income that I would have reported, obviously.”
Because the trial court relied on the husband’s Social Security statement to determine his average annual income, the trial court’s factual finding as to the husband’s income is not supported by the evidence of record.[1]
The wife also argues that, in determining the husband’s true income, the trial court should have considered the evidence of the parties’ lifestyle and the fact that they had no debt. In its judgment, the trial court expressly refused to rely on that evidence on the ground that any estimate of the parties’ marital income based on their lifestyle would be “speculation and conjecture.” We agree with the wife that, in so concluding, the trial court erred.
*132 In the context of making an equitable division of marital property, this court has approved of the consideration of a party’s lifestyle in determining that party’s income when the party’s lifestyle conflicted with the party’s reported income. In Turner v. Turner, 745 So.2d 880, 884 (Ala.Civ.App.1999), this court held that the trial court had not erred in imputing income to the husband based on evidence of his income several years before the judgment was entered. The husband had claimed to have no current income, but the evidence indicated that he was “ ‘in the real estate business and the computer field and ha[d] maintained a life style which ha[d] allowed him to accumulate assets while paying the bills for his needs and contributing to the bills of the [wife] and children.’ ” Turner, 745 So.2d at 884 (quoting trial court’s judgment). Thus, pursuant to Turner, a trial court is permitted to consider evidence of a party’s lifestyle in determining that party’s actual income.[2]
As interpreted by the trial court, the financial records indicate that the husband earned $34,000 annually. However, during the marriage, the parties enjoyed a “relatively affluent lifestyle,” as was found by the trial court. Without going into the minutia of the parties’ spending habits, which is only somewhat detailed above, it is apparent that they could not have lived as they did on that amount per year without accumulating massive debt; however, they had no indebtedness on any of their major assets at the time of the trial. As previously discussed, both parties agreed that the financial records did not accurately reflect the income of the husband’s business, which the trial court found was principally operated on a cash basis.
Given the foregoing circumstances, the trial court would not have been engaging in speculation and conjecture in using the lifestyle evidence in the record to compute the actual income of the husband. Its contrary conclusion was error.
The wife also contends, and we agree, that when assessing the equitable amount of periodic alimony, the trial court erred in considering that the husband, who was 63 years old at the time of the trial, may stop working. This court has held that a trial court may not speculate on future events that may affect the income stream of a spouse when determining periodic alimony. Edwards v. Edwards, 894 So.2d 698 (Ala.Civ.App.2004). Rather, if a paying spouse retires, thereby reducing his or her income, that spouse may petition for a modification of his or her periodic-alimony obligation as determined by the equities of the then-existing circumstances. Id. By assuming that the husband would *133 soon stop working, the trial court considered an impermissible factor in determining the fair amount of periodic alimony to be awarded to the wife.
We conclude, based on the foregoing, that the trial court made a factual error in calculating the husband’s income, a legal error in determining that it was precluded from considering evidence of the parties’ lifestyle, and a second legal error in considering a possible retirement by the husband. Because it appears that those errors impacted the trial court’s award of alimony, and because the question of alimony is intertwined with the issue of the division of the marital property, see Stone v. Stone, 26 So.3d 1232, 1236 (Ala.Civ.App.2009), the trial court’s judgment is due to be reversed and the cause remanded for reconsideration of those awards.
In the same context, the wife also argues that the trial court erred in finding that she could reasonably be expected to obtain gainful employment in the future. As previously discussed, the wife testified that she suffered from a number of maladies and that, as a result, she could not work. In contrast, the husband testified that the wife was capable of working, with the limitation that she could not stand for long periods. The evidence also showed that the wife had both an undergraduate degree in general health studies and a master’s degree in higher education; however, she had not been employed during the marriage, with the exception of occasionally assisting the husband at his law office. Based on the foregoing, we conclude that the trial court’s finding that the wife was capable of being gainfully employed was supported by the evidence; thus, we cannot conclude that the trial court erred in its determination in this regard. See Farmers Ins. Co., 873 So.2d at 254-55.
Finally, the wife contends that the trial court erred in its division of the parties’ debts. We do not reach this issue. Matters of debt allocation are part of the division of the marital property. See Combs v. Combs, 4 So.3d 1141, 1149-50 (Ala.Civ.App.2008) (assessing division of marital debts in reviewing propriety of property division). The division of marital property, in turn, is intertwined.with the issue of alimony. See Stone, 26 So.3d at 1236. Because we are reversing the trial court’s judgment with regard to its division of the marital estate and its award of periodic alimony, the trial court will have the opportunity, when entering a new judgment on remand, to address questions of debt allocation as part of its property division and award of alimony.
Based on the foregoing, we affirm the trial court’s order denying the wife’s discovery of the husband’s telephone records, we reverse the trial court’s divorce judgment insofar as it addresses alimony and property division, and we remand the cause to the trial court for the entry of a new judgment consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN and MOORE, JJ., concur.
BRYAN, J., concurs in the result, without writing.
THOMAS, J., concurs in part and dissents in part, with writing.

. The dissent states that the trial court did not make a finding of fact as to the amount of the husband’s income. In thus construing the final judgment, the dissent is being overly technical. Although it is true that the trial court did not set out exactly what it believed the husband’s income to be, it analyzed in some detail the amount of income reported in the husband’s Social Security statement and the tax returns. It used that analysis to reject the wife’s testimony regarding the husband's income, and it used that analysis to establish the husband’s alimony obligation. Thus, implicit in the trial court’s determination was a finding that the figures contained in the Social Security statement and the income-tax returns accurately reflected the husband's income.

. We note that, in the context of making an equitable division of marital property as well as determining family-support obligations, courts in other jurisdictions have also approved of the consideration of the parties’ lifestyle in determining income when the evidence of the parties' income so conflicted with the evidence of the parties' lifestyle as to make it unreliable. See, e.g., Johnson v. Fritz, 406 N.W.2d 614, 616 (Minn.Ct.App.1987) (holding that "a court can take into account the lifestyle of a sole business owner if the figures offered do not comport with the evidence of that person's lifestyle”); McCormick v. McCormick, 159 Vt. 472, 477, 621 A.2d 238, 240 (1993) (holding that "[Ijifestyle and personal expenses may serve as the basis for imputing income where conventional methods for determining income are inadequate”); and Palazzo v. Palazzo, 9 Conn.App. 486, 488-89, 519 A.2d 1230, 1232 (1987) (declining to hold the trial court in error for "concluding] that through the manipulative use of corporate funds, [a party had] maintained a lifestyle disproportionate to the amount of his claimed net monthly income” and noting that " '[w]here a party through his own wrongful conduct limits the financial evidence available to the court, that party cannot complain about the resulting calculation of a monetary award.' ” (quoting Vaiuso v. Vaiuso, 2 Conn.App. 141, 149-50, 477 A.2d 678, 684 (1984))).