THOMAS, Judge.
On June 24, 2013, the Jefferson County Department of Human Resources (“DHR”) filed in the Jefferson Juvenile Court separate petitions seeking the termination of the parental rights of B.M. (“the mother”) to Sc.M. (case no. JU-12-103246.02), Br.M. (case no. JU-12-103245.02), and L.M. (case no. JU-12-103243.02). Sc.M., Br.M., and L.M. are hereinafter referred to collectively as “the children.” DHR also sought the termination of the parental rights of the unknown father of L.M. and the parental rights of S.M. (“the father”), who is the father of Sc.M. and Br.M.
Sc.M. was born on July 6, 2001. DHR became involved with the family that year when it received reports that the mother and the father, who were unmarried at that time, had engaged in “physical abuse.” In 2003 DHR investigated a report that the parents had provided inadequate shelter for Sc.M., that Se.M. was “dirty,” and that the parents had abused illegal substances. Br.M. was born on April 28, 2005. In May 2005 DHR received a report that the parents had abused alcohol and that the father had threatened to kill the mother. The mother subsequently entered into a safety plan, agreeing to participate in a domestic-violence assessment and to seek shelter from the father if necessary for her safety or the safety of Sc.M. or Br.M.; however, on *159 November 24, 2005, the mother and the father married one another. In 2008 DHR received a report that the mother, Sc.M., and Br.M. were often seen walking in downtown traffic and that the mother was not watching Sc.M. or Br.M. In 2009 the mother filed a protection-from-abuse petition against the father in the Calhoun Circuit Court; the mother, Sc.M., and Br.M. then moved to a domestic-abuse shelter in Jefferson County. According to DHR, at that time the mother revealed that she had been severely abused as a child, that she had an eating disorder, that she suffered from “multiple personality disorder,” that she “heard voices,” and that she regularly “s[aw] dead people.” L.M. was born on October 22, 2010; S.M. is not the biological father of L.M.
On February 22, 2012, the juvenile court found the children dependent and awarded their custody to DHR; the children' were placed in foster care. Sc.M. was placed in therapeutic foster care because of his issues with anger and aggression.' In 2013 the mother had an automobile accident. Although she denied that she was the driver of the automobile, she was convicted of driving under the influence of drugs (“DUI”). It is clear that the mother was arrested again, because she was transported to the June 30, 2014, termination trial from the Birmingham city jail. However, the reason for her ■ 2014 incarceration is unclear from the record — the juvenile court’s termination judgments read: “[T]he Mother was incarcerated for -violating probation on a previous DUI or [for a] theft charge.” The mother admitted that she had failed to appear for a docket call, that she had failed to pay certain fines associated with the DUI conviction, and that she had also pleaded guilty to theft “a few months ago.” Regardless of her inability to recall the reason .why she -was incarcerated at the time of the termination trial, the mother appeared sure that she would be released from incarceration on December 8, 2014, because, she said, her lawyer was appealing “it.”
The juvenile court entered separate judgments on July 9, 2014, terminating the parents’ parental rights to, the .children. On July 17, 2014, the mother filed a post-judgment motion, and, on .July .22, 2014, the father filed a • postjudgment motion. On. July 22, 2014,: the mother filed a notice of appeal. On July 24, 2014, the juvenile court denied the mother’s and the father’s postjudgment motions. The mother’s appeal was held in abeyance pending the disposition of the postjudgment motions, and it “[became] effective upon the date of disposition of the last of all such motions”; thus, the mother’s notice of appeal was deemed filed on July 24, 2014. See Rule 4(a)(5), Ala. R.App. P. On August 8, 2014, the father filed a notice of appeal. This court consolidated the appeals ex mero motu.
The Father’s Appeal — Appeal 'No. mom
Rule 4(a)(2), (3), and (5), Ala. R,App. P., require the father to have filed his notice of appeal within 14 days of July 24, 2014 — the date -the juvenile court denied his postjudgment motion and the date ■the mother’s notice of appeal was deemed to have been filed under Rule 4(a)(5). See J.H.F. v. P.S.F., 835 So.2d 1024, 1026-27 (Ala.Civ.App.2002) (noting that the 14-day period under Rule 4(a)(2) ran from the effective date of the notice of appeal). However, the father filed his notice of appeal on August 8, 2014, which was 15 days after July 24, 2014. Accordingly, the father’s notice of appeal was untimely; an untimely appeal does not invoke the jurisdiction of this court. Thus, the father’s appeal must be dismissed. See. Rule 2(a)(1), Ala. R.App. P,; and Holt v. State *160 ex rel. Jones, [Ms. 2130726, Oct. 31, 2014] — So.3d -, - (Ala.Civ.App.2014).
The Mother’s Appeal — Appeal No. 2130880
The mother seeks our review of three issues — whether the juvenile court erred by terminating the mother’s parental rights when, she says, the alleged father of L.M. was not served, whether the juvenile court failed to consider maintenance of the status quo as a viable alternative to termination of her parental rights, and whether clear and convincing evidence supports the juvenile court’s findings.
“‘In reviewing factual findings in termination-of-parental-rights judgments, this court has a narrow standard of review that allows us to disturb those findings only when they are so unsupported by the evidence as to be plainly and palpably wrong. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). If a fact-finder reasonably could have been clearly convinced from the evidence in the record that a parent is unwilling or unable to discharge his or her parental responsibilities to and for the child, this court may not reverse a judgment terminating parental rights arising from ore tenus proceedings in a termination-of-parental-rights case. See J.B. v. DeKalb County Dep’t of Human Res., 12 So.3d [100] at 111 [ (Ala.Civ.App.2008) ].’
“M.H. v. Jefferson Cnty. Dep’t of Human Res., 42 So.3d 1291, 1294 (Ala.Civ.App.2010).”
T.M. v. M.D., 160 So.3d 1, 4 (Ala.Civ.App.2014).
First, we consider whether the juvenile court erred by terminating the mother’s parental rights when the alleged father of L.M. was not properly served.[1] See M.M. v. B.L., 926 So.2d 1038, 1042 (Ala.Civ.App.2005) (failure to properly serve a father rendered a judgment terminating his parental rights void). The mother lacks standing to assert the rights of a third party. See Ex parte Izundu, 568 So.2d 771, 772 (Ala.1990) (quoting Jersey Shore Med. Ctr.-Fitkin Hosp. v. Estate of Baum, 84 N.J. 137, 417 A.2d 1003 (1980)). Thus, her argument as to this issue fails.
Next, the mother contends that the juvenile court failed to consider maintaining the status quo as a viable alternative to termination of her parental rights. “Our supreme court has held that a juvenile court should maintain foster care ... without terminating parental rights when a child shares a beneficial emotional bond with a parent and the custodial arrangement ameliorates any threat of harm presented by the parent.” B.A.M. v. Cullman Cnty. Dep’t of Human Res., 150 So.3d 782, 786 (Ala.Civ.App.2014). The mother highlights the undisputed testimony that indicated that she had consistently exercised biweekly supervised visitation and that her interactions with the children were relatively appropriate.[2] However, there was no evidence presented indicating that the children had a strong emotional bond with the mother, although there was some testimony indicating that the mother felt emotionally bonded with the children. The *161 only testimony regarding any shared bond between the mother and the children was offered by Wydeesha Newsome, who supervised the mother’s visitation with the children, who testified that L.M. had “kind of warmed up” to the mother but, New-some said, L.M. did not “run to mom.”
At the time of the termination trial, the children had been out of the mother’s custody and in foster care for two years and four months. Yolanda King, a DHR employee, testified that DHR’s permanency plan for the children was adoption and that the children were adoptable.
“... ‘We have held that, “at some point, [a child’s] need for permanency must outweigh repeated efforts by DHR to rehabilitate” a parent. N.A. v. J.H., 571 So.2d 1130, 1134 (Ala.Civ.App.1990) (citing § 26 — 18—7(b)(4), Ala. Code 1975). Further, “[i]n R.L.B. v. Morgan County Department of Human Resources, 805 So.2d 721, 725 (Ala.Civ.App.2001), this court held that maintaining a child in foster care indefinitely is not a viable alternative to termination of parental rights.” T.G. v. Houston County Dep’t of Human Res., [39] So.3d [1146, 1152] (Ala.Civ.App.2009).
“[Montgomery Cnty. Dep’t of Human Res. v. W.J.,] 34 So.3d [686,] 693 [ (Ala.Civ.App.2009) ].”
Jefferson Cnty. Dep’t of Human Res. v. L.S., 60 So.3d 308, 316 (Ala.Civ.App.2010). Therefore, we conclude that, under circumstances in this ease, the juvenile court did not err by concluding that maintaining the status quo while the mother continued to attempt to rehabilitate herself was not a viable alternative to the termination of the mother’s parental rights.
Finally, the mother contends that there was not clear and convincing evidence supporting juvenile court’s findings. Section 12-15-319, Ala.Code 1975, provides, in pertinent part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parentf ] of a child [is] unable or unwilling to discharge [his or her] responsibilities to and for the child, or that the conduct or condition of the parent[ ] renders [him or her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[ ]. In determining whether or not the parent[ ] [is] unable or unwilling to discharge [his or her] responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
[[Image here]]
“(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child.
[[Image here]]
“(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
[[Image here]]
“(9) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child, where the parent is able to do so.
[[Image here]]
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of *162 human resources or licensed child-placing agencies, in an administrative review . or a judicial review.”
The juvenile court heard testimony indicating that the mother suffered from emotional and mental illnesses. See § 12-15-319(a)(2). .King testified that the mother had submitted to a psychological evaluation on March 5, 2012, and to a psychiatric evaluation June 4, 2012. Tamika Thomp-kins, a DHR employee, testified that the evaluations indicated that the mother needed mental-health treatment. An exhibit that is included in the record indicates that on June 5, 2012, the mother was diagnosed with depression, post-traumatic stress disorder, and a borderline personality disorder. King said that DHR had provided in-home counseling services to the mother, which were discontinued because the mother was noncompliant. King and Thompkins said that the mother had failed to take her medications as prescribed;' however, the mother testified that she took Celexa, which is prescribed for persons suffering from depression, and Se-roquel, which is prescribed for persons suffering from bipolar disorder or major depressive disorder.
Diana Paulk, Ph.D., a licensed psychologist and the owner of Birmingham Anxiety and Trauma Therapy, testified that she had met with the mother on March 6,2012. She said that the mother was late for her appointment and that the mother’s hair and teeth were not brushed, that her shoelaces were not tied, that her hands were dirty, that her makeup was' smeared, and that the mother appeared to be “really tired” or under duress during the interview. Dr. Paulk said that the mother admitted that she “had had some DUIs in 1999” and that she had spent “a couple of weeks in jail.” Dr. Paulk said that the mother reported that her mind constantly raced and that she actively “disassociate[d]” from herself “most of the time.” Dr. Paulk said that the mother reported that she had been a victim of domestic violence and of sexual abuse by family members over, a number of years. The mother told Dr. Paulk that she had been hospitalized “for being cut, stabbed, and shot.” Dr. Paulk said that the mother indicated that she had been institutionalized during much of her childhood because she had experienced “violent mood swings.” Dr. Paulk said that the mother reported that she was anxious in “every situation,” that she was depressed, that she had attempted suicide by overdosing on prescription medications multiple times in her 20s, and that she was “bipolar.” Dr. Paulk testified that bipolar disorder is incurable; furthermore, Dr. Paulk said, treatment of the symptoms of the disorder is difficult because medication is a major component of the treatment. Dr. Paulk said that the mother reported that she had been prescribed lithium, Thorazine, Valium, and Xanax in the past.
Dr. Paulk said that the mother told her that she also suffered from dissociative identity disorder (which is alsp known as multiple-personality disorder), and that she received a monthly disability benefit of $906 due to her mental illness. Dr. Paulk testified that it is unlikely that a person could recover from dissociative identity disorder without treatment; however, she testified that medication can help patients deal with the anxiety component of the disorder.
Dr. Paulk testified that she had administered several diagnostic tests to the mother; however, Dr. Paulk could not score the mother’s tests. According to Dr. Paulk, 'the mother had “faked” her answers on the personality test'to'make her problems appear worse than théy were, which, according to Dr. Paulk, was a common tendency of people attempting to qualify for disability benefits. Dr. Paulk said that the mother gave the most extreme answer to *163 every question on the parenting-stress test, which, although possible, Dr. Paulk said, was an “unexpected” result. Dr. Paulk said that the mother did not read the questions before indicating her answers on the “State Trait Anger Expression Inventory” test and that, by the end of that test, the mother’s “pencil was just trailing off.” On the,“Beck Depression Inventory,” the mother had answered some questions twice and had provided no answers for other questions. Because Dr. Paulk determined that the mother had failed to understand the serious nature of the interview and was not “very interested” in having her parenting skills evaluated, Dr. Paulk recommended an inpatient psychiatric evaluation. In conclusion, Dr. Paulk said: “I would recommend severe caution in terms of reuniting or giving her, independent responsibility for her children.”
The juvenile court heard testimony that DHR’s reasonable efforts to rehabilitate the mother had failed. See § 12-15-319(a)(7). It was undisputed that DHR had offered services "and that the "mother had participated in the services provided. DHR witnesses testified that DHR had provided substance-abuse counseling, parenting classes, domestie-violence-prevention classes, supervised visitation with the children, and a treatment plan that had included in-home family support once or twice per week and family therapy. However, Martisa Mauldin,, a therapist, said that the 'mother had not displayed an ability to follow through with the skills Maul-din had attempted to teach. Mauldin said:
“I did not see evidence [of the mother’s parenting skills] improving or changing. The concern that I had in the session I did have with mom was mom’s ability to understand the need to parentally observe kind of what the children were doing. At the time my understanding was that the children were having some violence in the home. The boys.”
The juvenile court heard testimony indicating that the mother had not provided financial support for the children. See § 12-15-319(a)(9). King and Thompkins said that the mother had reported that she received disability benefits but that the mother had failed .to provide DHR verification of that income. King-said that the mother had been employed at the Tutwiler Hotel from November 2012 through February 2013; however, Thompkins said the mother was terminated from that employment when she was arrested and incarcerated on the DUI conviction. Herman Henderson, the mother’s pastor, testified that the mother worked with a program called “Stop the Violence.” King said that the mother was “paid in food and gas when she did have a car and sometimes she was paid maybe twenty-five dollars or so.” Henderson said that the mother was paid as “contract labor”; he said she once “made somewhere close to about a thousand dollars.”
The juvenile court heard testimony indicating that the mother failed to adjust her circumstances to meet, the needs of the children. See .§ 12-15-319(a)(12). King testified that at the time of the termination trial the children had been in foster care for 28 months, and it was clear that the mother was again incarcerated at.,that time. Before the mother was arrested,. King said, the mother had resided at a facility operated by the YWCA. According to the mother, she. left the YWCA facility because the term for which she was allowed to stay had expired. Allison Schubert, the housing specialist for the YWCA of Cental Alabama, testified that the mother was evicted from the YWCA facility for several reasons, including because she had failed to consistently participate in the required “case management meetings,” because a security guard had reported that the mother had appeared intoxicated on one occasion, because the mother had had *164 a “verbal altercation with another resident,” and because the mother had harassed a YWCA staff member. Schubert’s testimony is supported by a letter that appears in the record. The letter, signed by Monica Shields, the YWCA’s coordinator of resident services, indicated that the mother’s residency at the YWCA facility was nonrenewed two months before the allowable term expired because of the unsanitary condition of her apartment and the specific disruptive behaviors that had been described by Schubert.
Therefore, we conclude that the juvenile court did not err by determining that clear and convincing evidence demonstrated that the mother was unable or unwilling to discharge her parental responsibilities to and for the children and that that condition was unlikely to change in the foreseeable future based upon the testimony and documentary evidence indicating that the mother suffers from various mental and emotional illnesses, that DHR’s reasonable efforts to rehabilitate the mother had failed, that the mother had failed to provide material support for the children, and that the mother had failed to adjust her circumstances to meet the needs of the children. We further conclude that the juvenile court did not err by terminating the mother’s parental rights because the alleged father of L.M. was not served or by failing to consider maintenance of the status quo as a viable alternative to termination; therefore, the juvenile court’s judgments terminating the mother’s parental rights to the children are affirmed.'
2130880 — AFFIRMED.
2130924 — APPEAL DISMISSED.
THOMPSON, P.J., and PITTMAN, MOORE, and DONALDSON, JJ., concur.

. The mother asserted that T.J. was the father of L.M. and that he resided in Calhoun County; the unknown father o'f L.M. was served by publication in Jefferson County.

. Wydeesha Newsome testified that during visitations she supervised she had observed the mother telling the children to shake vending machines to get snacks for which they had not paid and that, during one period, the mother had smoked cigarettes during the visits.