PITTMAN, Judge.
These appeals seek review of a judgment entered by the Lauderdale Circuit Court ("the trial court") in a divorce action brought by Robert Joseph Rohling ("the husband") against Lylie Alexandra Rohling ("the wife"). We have consolidated the appeals for the purpose of addressing them in a single opinion.
In appeal no. 2160859, the husband seeks review of that judgment insofar as it awarded the wife alimony in gross, awarded the wife periodic alimony, awarded the wife child support, awarded the wife a share of the husband's retirement accounts, and ordered the husband to maintain life insurance on his life for the benefit of the wife and the parties' two minor daughters ("the children"). In appeal no. 2160860, Andrew L. McGee, Terry L. Mock, and Bruce Gordon, the attorneys who represented the husband in the divorce action, seek review of the trial court's judgment insofar as it ordered them or the husband to pay fees charged by the wife's expert witness.
Procedural History
In April 2015, the husband sued the wife for a divorce; thereafter, the wife counterclaimed for a divorce. At the wife's behest, the trial court appointed a guardian ad litem for the children. The action was tried on September 7, 2016; October 6, 2016; November 1, 2016; February 16, 2017; and *56 February 24, 2017. On April 13, 2017, the trial court entered a final judgment. Among other things, the judgment dissolved the parties' marriage on the ground of incompatibility, awarded the parties joint legal custody of the children, awarded the mother "primary physical custody" of the children, and awarded the husband visitation that would result in the children's being in his care approximately one-half of the time. In addition, the judgment provided, in pertinent part:
"5. CHILD SUPPORT. The evidence showed that the Husband receives a salary from Rohling Dental Laboratory, LLC reported on his W-2 at $96,658.22 ( [Husband]'s Ex. 17). Also, the Husband testified that over the course of any given year he would make various income draws from the business (Schedule K-1 for Partnership or S Corporation), which even in the down-year of 2016 still averaged approximately $7,000 per year, for a total annual income of $103,658.22 (or $8,638 per month). Compare [Husband]'s Ex. 18 (CS Income Affidavit dated February 23, 2017) where the Husband calculated his monthly gross income to be $8,054.83. Again, these specific income figures for the Husband are for 2016 based on gross sales of approximately $678,000 per year for Rohling Dental Laboratory, LLC, according to the trial testimony and exhibits.
"Prior to 2016, the business averaged more in gross sales. Other testimony and financial analysis prove actual average gross sales from 2010 through 2015 were $1,002,112.00. Based on average gross sales for 2010 through 2015, the Husband calculated his income at $136,572 per year or $11,381 per month (Joint Exhibit, [Husband]'s Ex. # 1 & [Wife]'s Ex. # 1, CS Income Affidavit dated September 17, 2016).
"The Wife found employment as a legal assistant with the law firm of Yates & Spry[,] reporting monthly income that varied from $2,356.00 ( [Wife]'s Ex. 10) to $2,513.00 ( [Wife]'s Ex. 11) per month. The Wife lost her job with that firm while this matter was pending, then was hired by Attorney Gary Wilkinson at a rate of $1,733.00 per month ( [Wife]'s Ex. 25).
"This Court finds that the amount of income of $11,381.00 per month is properly attributed to the Husband based on the totality of testimony and evidence at trial. For purposes of the child support calculation, this Court defaults to the amount provable for five (5) of the past six (6) years, as opposed to calculating the child support obligation based on the anomaly of 2016. Further, using empirical data from 2010 through 2015 to calculate the Husband's income ( [Husband]'s Ex. 1) takes into account his discretion to make income draws as he sees fit, thereby allowing him to adjust his weekly or monthly income at will.
"The Wife's income, on the other hand, is $1,733.00 per month.
"Health Insurance for the children is paid directly through the Husband's business as a business expense and, based on the testimony at trial, should not be deducted from the child support calculation as part of the Husband's income or salary from the business. To do so would represent a deviation from well-established pattern and practice. Multiple CS-42 Child-Support Guidelines forms and income affidavits were admitted into evidence by both parties, and at no time did either party claim any manner of 'health-insurance costs' (line 6) to offset the amount of child support owed. Because the insurance is a benefit of the Husband's employment that he does not directly pay, the premium *57 is not included for purposes of Rule 32 Child Support calculation.
"Therefore, the Husband shall pay to the Wife as child support ... the sum of Fifteen Hundred Fifty Dollars and No/100 ($1,550.00) per month, commencing on the 1st day of May, 2017 ....
"6. CHILD SUPPORT ARREARAGE. After the Husband filed his Petition for Divorce, the parties continued to jointly occupy the marital residence. The Wife moved out of the marital residence and established her own residence on or about July 9, 2016. The Husband remained to make repairs and provide upkeep to the marital residence to facilitate sale of the home and division of their home's equity, which was accomplished ....
"Therefore, based on the facts and evidence, the Husband owes retroactive child support from July 2016 through April 2017 (ten months) in the amount of $15,500.00. The retroactive child support shall be paid at the rate of Five Hundred Dollars and No/100 ($500.00) per month, beginning April 15, 2017. ...
"The total amount of child support due each month is $2,050.00 beginning May 1, 2017, and then on the 1st day of each month thereafter until the arrearage is paid in full.
"7. HEALTH INSURANCE. The [husband] shall continue to provide major medical health insurance coverage for the minor children. ...
"8. ST. JOSEPH SCHOOL TUITION. The [parties' younger] child ... currently attends St. Joseph School. By the testimony of both parties and the recommendation of the Guardian Ad Litem ..., it is in the best interest of the [parties' younger] child ... to remain in her present school environment at St. Joseph School. The Husband testified that he is willing to continue to pay the tuition for [the parties' younger child] to attend St. Joseph School. Therefore, based on express consent and agreement to pay by the Husband, the Husband shall continue to pay the tuition for [the parties' younger child] to attend St. Joseph School for so long as [she] attends St. Joseph School, which goes through 8th grade. At which point, the parties intend for both children to attend Florence City Schools.
"....
"13. DEBTS. Each party shall be responsible for any and all debts in their sole name, free and clear of any contribution from the other party, unless specifically addressed. The indebtedness from the marriage assigned to each party was based on testimony at trial where each party agreed to assume the debts assigned.
"The Husband, by consent and agreement from his testimony, shall be responsible for the remaining balances owed on the following debts:
"A) Bank Independent Mortgage (related to Rohling Properties, LLC)
"B) Best Buy credit card ...
"C) Lowe's credit card ...
"D) BBVA Compass Bank card ... (1990 Regal Valanti Boat Loan) ($11,000.00)
"E) Fifth Third Bank secured by the 2010 Lincoln Navigator ($13,500.00)
"F) Bank of America credit card ... ($22,000.00)
"G) U.S. Government for any unpaid tax obligation, specifically $22,000.00 for tax year 2014 and $6,000.00 for 2015 related to the Husband using monies from 401(k) or other retirement accounts for business operations
"....
"The Wife, by consent and agreement from her testimony at trial, shall be *58 responsible for the remaining balances owed on the following debts ( [Wife's] Ex. 17):
"A) Belk credit card ... ($1,721.54)
"B) Sears Premier Card ... ($1,593.69)
"C) Bank of America Visa credit card ... ($7,811.73)
"D) Advantage Mastercard (American Aviator) ... ($1,480.00)
"E) Loft Clothing Store (Loveloft) credit card ....
"....
"16. BOAT. The Husband is awarded all right, title, and interest in and to the 1990 Regal Villante Boat ... ('boat') and, based on the trial testimony of both parties, the boat shall be sold as soon as reasonably possible. All proceeds from sale of the boat shall be applied to the debt obligations assumed by the Husband, beginning with BBVA Compass Bank card ... (1990 Regal Valanti Boat Loan) ($11,000.00)
"....
"17. LIFE INSURANCE. The Husband at his expense shall maintain the current life insurance policy on his life with Northwestern Mutual with a death benefit of $1,000,000.00 payable to the Wife as primary beneficiary and payable to the parties' children in equal amounts as secondary co-beneficiaries. ... After the Husband has paid in full the amounts required of him in Paragraph 20 of this Final Decree, then he shall be entitled to reduce the death benefit to $500,000.00, and the death benefit shall be maintained in full force and effect so long as child support and/or periodic alimony is payable by the Husband under the terms of this Final Decree.
"....
"18. PERIODIC ALIMONY. The Husband shall pay to the Wife as periodic alimony the sum of Eight Hundred Dollars and no/100 ($800.00) per month commencing on the 1st day of May, 2017 and on the 1st day of each month thereafter until the Wife's death, remarriage or cohabitation as defined by law, whichever first occurs. ...
"19. BUSINESS. There are two interrelated business entities: Rohling Dental Laboratory, LLC ('dental lab') and Rohling Properties, LLC. Rohling Dental Laboratory, LLC is owned jointly by the Husband (90%) and his father (10%). The dental lab is the primary asset that generates income. Rohling Properties, LLC is owned jointly by the Husband (50%) and [the] Wife (50%), Rohling Properties' only asset is ... a church building converted to the dental lab. Rohling Properties is responsible for the mortgage on the property held by Bank Independent. Rohling Dental Laboratory, LLC pays rent to Rohling Properties, LLC in the amount of the mortgage, which is then paid to Bank Independent, according to the testimony. Rohling Properties does not operate at a profit or loss but is merely a 'flow-through' entity to pay the mortgage.
"Rohling Dental Laboratory, LLC was founded in 2003 and moved to its present location in 2005. Initially, the Husband's mother was the bookkeeper and his father was active in the business. After his mother and father, in effect, retired, the business is now run by the Husband, along with his brother and sister. After the Husband's mother, the Husband's sister took over the function of bookkeeper for the business. The primary dispute between the parties centered on 'valuation' of the Husband's dental lab business.
"The Husband testified extensively concerning his business and was received by the Court as an expert based *59 on his knowledge, skill, experience, training and education both managing the dental lab and concerning all financial matters related to the dental lab. See R. 702, Ala. R. Evid.
"In turn, the Wife employed Jeremy Blackburn, CPA, CVA, MAFF, of the accounting firm CDPA, PC ('Blackburn').[1 ] Blackburn was employed or engaged by the Wife 'to estimate the calculated fair value of the Company to be used in negotiations for a dissolution of marriage' ( [Wife]'s Ex. 21).
"The Husband, by and though specially associated co-counsel, Bruce Gordon, attempted to attack Blackburn's qualifications as an expert witness by filing an extensive motion and bench brief entitled 'Petitioner's Motion in Limine and/or Motion to Dismiss.' After oral arguments, the Court denied the Husband's motion because the points made went to the weight, not the admissibility, of the evidence. Likewise, Mr. Gordon took Blackburn on an extensive voir dire examination. The main point of the Husband's objection and voir dire focused on the same issue. The Husband objected based on the methodology employed by Blackburn, among many other factors examined by the Husband's counsel. Specifically, the Husband argued that Blackburn conducted the wrong manner of 'valuation,' that Blackburn conducted a type of 'valuation' referred to in the industry as a 'calculation engagement' as opposed to the more thorough and accurate 'valuation engagement.'
"Co-Counsel for the Husband spent an extensive portion of his cross-examination educating the court, through the testimony of Blackburn, on industry standards for a 'calculation engagement' versus a 'valuation engagement' (see [Husband]'s Ex. 15, Statements on Standards for Valuation Services). Throughout the entire course of the argument, voir dire, and cross-examination it was evident that Blackburn met all the requirements of R. 702, Ala. R. Evid. to qualify him as an expert capable of rendering an expert opinion regarding: 1) financial analysis of the documents provided by Rohling Dental Laboratories, LLC (see [Wife]'s Ex. 19, Financials from Rohling Dental Laboratories, LLC entered into evidence by agreement and stipulation of the parties); 2) valuation of the business pursuant to the requirements for a 'calculation engagement'; and 3) valuation of the business pursuant to the requirements for a 'valuation engagement.' This Court now very well understands that Blackburn only conducted the lesser 'calculation engagement.' However the evidence and record is clear, based on the knowledge, skill, experience, training and education of the proffered expert, Blackburn was properly qualified as an expert witness in those specific areas.
"Analysis of financial records from Rohling Dental Laboratory, LLC admitted into evidence and testified to or summarized by Blackburn indicated that for the five (5) year window from 2010-2015, the Husband's business generated annual sales (gross) of approximately $1,000,000.00 per year, with the actual average annual sales being calculated at $1,002,112.00. Blackburn also testified that the Husband could take $54,000.00 annually out of the business and not affect overall business operations. Lastly, Blackburn testified that the 'calculation engagement' he conducted resulted *60 in a 'valuation' of Rohling Dental Laboratories, LLC as follows:
"$530,080.00 BIZCOMPS Equity Value
"$505,710.00 Pratt Stats Equity Value
"$512,000.00 Guideline Transaction Method
"( [Wife]'s Ex. 21, Calculation of Valuation of Rohling Dental Laboratories, LLC as of December 31, 2015). The conclusion reached in Blackburn's report states, 'Based on the facts, assumptions, and methodology using our analysis, the calculated estimated fair value of the Company, as of December 31, 2015 is: $509,000.' [2 ]Id.
"In determining what, if any, weight to give these findings, the Court fully considered the points made by the Husband by and through Co-Counsel Bruce Gordon. A 'valuation engagement' is more thorough and accurate because it is conducted according to more arduous accounting standards. For example, the accountant will 'go behind' the books or financials provided to verify their accuracy. Also, the accountant conducting a 'valuation engagement' would inspect the premises of the business to personally evaluate the facilities, equipment, fixtures, and inventory for purposes of ascertaining their actual value, depreciation, etc. With a 'calculation engagement' it is basically a 'paper review' along with some industry research for similarly situated businesses (comps) which results in more of an estimated value, as opposed to a true valuation.[3 ](And the Court readily acknowledges that this is a grossly oversimplified summary of the many, many points made by the Husband on voir dire and cross-examination, by and through associated co-counsel Bruce Gordon, but this summary suffices to prove the point.)
"The Court, however, declines to take the next step urged by the Husband, which is to consider Blackburn's 'estimate' based on his 'calculation of value' so faulty and flawed as to be purely based on speculation or conjecture, therefore inadmissible.
"Blackburn employed methods recognized and accepted by [the] accounting industry for accountants conducting 'calculation engagements' and that evidence *61 from a qualified expert is due to be considered by this Court. The fact that a more arduous or accurate method (valuation engagement) exists does not preclude the Court's consideration of Blackburn's findings. No evidence, including any portion of the Husband's testimony, directly contradicts the findings of Blackburn's financial evaluation of the Husband's business for the stated years 2010 through 2015. And the Husband did not employ his own expert or pay the increased fee to Blackburn to conduct the more rigorous 'valuation engagement.'
"The Husband was called as a rebuttal witness, in part, to rebut Blackburn's testimony. However, the point of much of the Husband's testimony, whether in his case-in-chief or rebuttal, was to prove that his business fundamentally changed in 2016, thereby discrediting Blackburn's analysis based on gross sales from 2010-2015 (gross sales averaging $1,002,112). For example, in his case-in-chief, the Husband testified that annual sales for the lab decreased in 2016 to $500,000 to $550,000 due primarily to the changed business environment. In rebuttal, the Husband produced the 'Profit and Loss' report from January through December 2016 (P & L report for 2016) which indicated gross sales for 2016 were actually $672,824.78. It should also be noted that the same P & L report for 2016 indicated a loss of ($23,189.90) for the business, which was the first year the business did not make a profit. The Husband testified that, in his opinion, several factors contributed to the reduction in annual sales for the year 2016, specifically loss of several major clients or accounts, and that he believed the business would rebound.
"Based on the foregoing evidence, along with all of the other evidence and testimony at trial, the Husband is awarded all right, title and interest in and to the business known as Rohling Dental Laboratory, LLC and all right, title and interest in and to the business known as Rohling Properties, LLC. The Wife is hereby divested of all her right, title and interest in and to Rohling Dental Laboratory, LLC and Rohling Properties, LLC. The Husband shall have the exclusive ownership, use and possession of the businesses and all assets of Rohling Dental Laboratory and Rohling Properties, LLC. The Husband is awarded all equipment, fixtures, office furniture, supplies, inventory, accounts payable and goodwill associated with and/or owned by said businesses. The Husband shall assume and be solely responsible for any and all debts incurred by and/or associated with the businesses Rohling Dental Laboratory, LLC and Rohling Properties, LLC.
20. LUMP-SUM PROPERTY SETTLEMENT/ALIMONY IN GROSS. The Husband shall pay to the Wife as a lump-sum property settlement or alimony in gross the total sum of $170,000. This obligation may be paid in full or structured in installments.
"INSTALLMENTS. If paid in installments, then the installment amounts owed shall be structured as follows:
"$5,000 due on or before October 15, 2017;
"$7,500 due on or before October 15, 2018;
"$7,500 due on or before October 15, 2019;
"$10,000 due on or before October 15, 2020.
"This initial period of forty-eight (48) months is provided to afford the Husband time to pay down various debts and adjust or grow his business.
*62 "The remainder of the alimony in gross award ($140,000) shall be paid in annual installments in the amount of $25,000.00 due on October 15 in each of the years 2021, 2022, 2023, 2024, 2025, and the remaining sum of $15,000 due on or before October 15, 2026.
"....
"BASIS FOR THE AWARD OF ALIMONY: The award of $170,000 in alimony in gross is approximately one-third (1/3) of the value of the Husband's business as estimated by Blackburn and proven at trial ($509,000.00). This award of one-third (1/3) is made not to devalue the contributions that the Wife made to the marriage, but to serve a multi-fold purpose to accomplish equitable division of the parties' marital property based on the totality of the evidence: 1) acknowledge the Wife's substantial contribution to the marriage as it relates to the overall success of the Husband's business by the very award of alimony in gross; 2) allow, if not incentivize, the Husband to continue to own and operate what has proven to be a successful small business, which is critical to the Husband's ability to continue to provide for his children and meet the other financial obligations set out in this order; and 3) to balance the award of both periodic alimony and alimony in gross with the Husband's ability to pay based on the amount of debt accumulated by the parties over the course of their marriage.
"The primary factor in the Court ordering one-third (1/3), as opposed to half (1/2), of the proven value of the dental lab is the Husband's ability to pay. Stated another way, the Husband assumed or has been ordered to assume approximately $80,000 in debt, not including the mortgage related to the dental lab (paragraph 13, Debt, above). The $80,000 in marital debt combined with the award of $170,000 alimony in gross, totaling approximately $250,000, equals approximately one-half (1/2) of the estimated value of the dental laboratory ($509,000.00). In conclusion, the amount of debt assumed by the Husband is, of necessity, balanced by this Court against the Husband's ability to pay in order to arrive at the total award of alimony in this matter, resulting in both periodic alimony and alimony in gross.
"21. NONDISCHARGEABILITY. The Husband's property settlement and alimony in gross obligation under paragraph 15 shall be nondischargeable by the Husband in bankruptcy.
"22. FINANCIAL ASSETS. The Wife is awarded the 401(k) account in her name with Edward Jones and any and all other 401(k) and/or similar plans, mutual funds and/or similar plans, pension and/or retirement funds and any and all bank accounts in her sole name.
"The Wife is awarded one-half (1/2) of the 401(k) in the Husband's name with Edward Jones and one-half (1/2) of the IRA in the Husband's name with Raymond James. The Husband is awarded the remaining one-half (1/2) of the 401(k) in his name with Edward Jones and the remaining one-half (1/2) of the IRA in his name with Raymond James and any and all other 401(k) and/or similar plans, mutual funds and/or similar plans, pension and/or retirement funds and any and all bank accounts in his sole name.
"....
"23. EXPERT WITNESS FEES & EXPENSES. The Court finds that, under Rule 26(b)(5)(A)(ii) and Rule 26(b)(5)(C), Ala. R. Civ. P., the Husband shall make payment directly to Jeremy Blackburn, CDPA, PC in the amount of $1,040.00, which the Court determines is a reasonable fee for time spent by Mr. Blackburn in responding to discovery *63 propounded by the Husband to produce documents at deposition, and for time spent by Mr. Blackburn in sitting for [the] deposition noticed by the Husband. ...
"In addition, the Court orders the Husband to reimburse the Wife the sum of $3,500.00, representing one-half (1/2) of the $7,000.00 in fees paid to Jeremy Blackburn by the Wife in obtaining facts and opinions from the expert.
"This Court's decision to require payment of one-half (1/2) of the expert witness fee engaged by the Wife was decided, in no small part, because the Husband, by and through counsel, suppressed discovery. Specifically, counsel for the Husband suppressed bank statements and bank reconciliations prepared by the bookkeeper of Rohling Dental Laboratory, LLC (and it should he noted that the bookkeepers were the Husband's mother, then the Husband's sister). The decision by counsel for the Husband to withhold or suppress this type of mainstay financial documentation until the dead last minute of trial is beyond the capacity of this Court to understand. It shall be between the Husband and his counsel whether this cost ($3,500.00) should pass through to the client or be borne in full by the attorney."
The husband timely filed a Rule 59, Ala. R. Civ. P., postjudgment motion challenging, among other things, the award of child support, the award of periodic alimony, the award of alimony in gross, the requirement that the husband maintain a $1,000,000 insurance policy on his life for the benefit of the wife and the children, and the requirement that the husband or his attorneys pay a portion of the fee of the wife's expert witness. The trial court held a hearing and, thereafter, on June 19, 2017, entered an order amending the April 13, 2017, judgment. In pertinent part, that order stated:
"The Court's original order dated April 13, 2017 is amended as follows:
"5. CHILD SUPPORT. The Husband shall pay to the Wife as child support ... the sum of One Thousand One Hundred and Thirty-Eight ($1,138.00) Dollars per month, commencing on the 1st day of July, 2017 ....[4 ]
*64 "6. ARREARAGE. Based on amendments to child support, the child support arrearage (July 2016 through June 2017) due is amended to Thirteen Thousand Six Hundred and Fifty-Six ($13,656.00) Dollars, to be paid at a rate of Two Hundred and Fifty ($250) Dollars per month beginning July 1, 2017 ....
"The total amount of child support due each month is $1,388.00 beginning July 1, 2017, and then on the 1st day of each month thereafter until the arrearage is paid in full.
"8. ST. JOSEPH SCHOOL TUITION. Despite the Husband agreeing to pay this in his sworn testimony, attorneys for the Husband objected to this provision of the order in their post-judgment motion. As such, this paragraph is rescinded.
"....
"20 LUMP-SUM PROPERTY SETTLEMENT/ALIMONY IN GROSS. The Husband shall pay to the Wife as a lump-sum property settlement or alimony in gross the total sum of ONE HUNDRED AND TWENTY-FIVE THOUSAND ($125,000.00) DOLLARS. This obligation may be paid in full or structured in installments.
INSTALLMENTS. If paid in installments, then the installment amounts owed shall be structured as follows:
"$1,500 due on or before October 15, 2017;
"$1,500 due on or before October 15, 2018;
"$5,000 due on or before October 15, 2019;
"$2,500 due on or before October 15, 2020;
"$7,500 due on or before October 15, 2021;
"$7,500 due on or before October 15, 2022;
"$10,000 due on or before October 15, 2023;
"$10,000 due on or before October 15, 2024.
"The remainder of the alimony in gross award ($79,500) shall be paid in annual installments in the amount of $15,000.00 due on October 15 in each of the years 2025, 2026, 2027, 2028, 2029, and the remaining sum of $4,500 due on or before October 15, 2030.
"....
"23. EXPERT WITNESS FEE. The $7,500 [5 ] amount ordered to be paid by the [husband] or counsel for the [husband], if paid by the [husband] can be paid in monthly installments of $100/mo[nth] beginning on July 15, 2017 and each month thereafter until paid in full.
"Unless otherwise amended, all other provisions of the order entered April 13, 2017, remain in full force and effect."
*65 On July 28, 2017, the husband filed a notice of appeal, and McGee, Mock, and Gordon filed a separate notice of appeal.
Standard of Review
" ' " '[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.' " ' Water Works & Sanitary Sewer Bd. v. Parks, 977 So.2d 440, 443 (Ala. 2007) (quoting Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala. 2005), quoting in turn Philpot v. State, 843 So.2d 122, 125 (Ala. 2002) ). ' "The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment." ' Waltman v. Rowell, 913 So.2d 1083, 1086 (Ala. 2005) (quoting Dennis v. Dobbs, 474 So.2d 77, 79 (Ala. 1985) ). 'Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge's conclusions of law or the incorrect application of law to the facts.' Waltman v. Rowell, 913 So.2d at 1086."
Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So.2d 924, 929 (Ala. 2007).
Analysis
I. Appeal No. 2160859
A. Child Support
The husband argues that the trial court erred in awarding the wife child support because, the husband says, the trial court failed to deviate from the Rule 32, Ala. R. Jud. Admin., guidelines in calculating his child-support obligation despite the fact that the award of visitation to the husband would result in the children's being in his care approximately one-half of the time. In pertinent part, Rule 32(A), Ala. R. Jud. Admin., provides:
"There shall be a rebuttable presumption, in any judicial or administrative proceeding for the establishment ... of child support, that the amount of the award that would result from the application of these guidelines is the correct amount of child support to be awarded. A written finding on the record indicating that the application of the guidelines would be unjust or inappropriate shall be sufficient to rebut the presumption if the finding is based upon:
"....
"(ii) A determination by the court, based upon evidence presented in court and stating the reasons therefor, that application of the guidelines would be manifestly unjust or inequitable.
"(1) ... Reasons for deviating from the guidelines may include, but are not limited to, the following:
"(a) Shared physical custody or visitation rights providing for periods of physical custody or care of children by the obligor parent substantially in excess of those customarily approved or ordered by the court[.]
"....
"The existence of one or more of the reasons enumerated in this section does not require the court to deviate from the guidelines, but the reason or reasons may be considered in deciding whether to deviate from the guidelines."
(Emphasis added.)
In Boatfield v. Clough, 895 So.2d 354 (Ala. Civ. App. 2004), a father appealed from a judgment entered in a divorce-modification action that increased the amount of his child-support obligation based on an increase in his income since the entry of the divorce judgment. On *66 appeal, the father claimed that, because he was caring for the children 6 days out of every 14-day period, he and the mother were exercising joint custody and that, therefore, the Etowah Circuit Court had erred in calculating his child-support obligation in accordance with the Rule 32 guidelines. Specifically, he argued "that where parents are awarded joint custody and exercise roughly equal custodial periods, the application of the Child Support Guidelines is manifestly unjust and inequitable and, therefore, a deviation from the Child Support Guidelines is required." 895 So.2d at 356. Rejecting that argument, this court stated:
"[T]he father's contention is refuted by the text of Rule 32 itself. Although Rule 32 acknowledges that, among other reasons, '[s]hared physical custody or visitation rights providing for periods of physical custody or care of children by the obligor parent substantially in excess of those customarily approved or ordered by the court' may constitute a '[r]eason[ ] for deviating from the guidelines,' the rule further notes that '[t]he existence of one or more of the reasons enumerated in this section does not require the court to deviate from the guidelines.' Rule 32(A)(1), Ala. R. Jud. Admin. (emphasis added). 'An award of child support resulting from the application of the guidelines is presumed correct,' Rogers v. Rogers, 598 So.2d 998, 1000 (Ala. Civ. App. 1992), and the judgment under review in this case fully comports with the text of Rule 32 and the Child Support Guidelines."
Id.; see also Whaley v. Whaley, 218 So.3d 360, 363 (Ala. Civ. App. 2016) (following Boatfield ). Accordingly, in the present case, the trial court was not required to deviate from the Rule 32 guidelines because the children would be in the care of the husband approximately one-half of the time. See Rule 32(A)(1); Boatfield; and Whaley.
The husband also argues that the trial court awarded the parties split custody and should have calculated child support pursuant to Rule 32(B)(9), Ala. R. Jud. Admin. However, we cannot reverse the trial court's judgment based on that argument for two reasons. First, the husband raises that argument for the first time on appeal. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992) ("[An appellate court] cannot consider arguments raised for the first time on appeal; rather, [an appellate court's] review is restricted to the evidence and arguments considered by the trial court."). Second, the trial court did not award the parties "split custody" as that term is used in Rule 32(B)(9). As this court explained in Allen v. Allen, 966 So.2d 929 (Ala. Civ. App. 2007) :
"The trial court may use the split-custody method only when ' "each parent has primary physical custody of one or more children." ' Boatfield v. Clough, 895 So.2d 354, 357 (Ala. Civ. App. 2004) (quoting Rule 32(B)(9), Ala. R. Jud. Admin.).
" '[O]ur Supreme Court has not seen fit to direct the use of [the split-custody] method in joint-custody situations; instead, the Guidelines "do not specifically address the problem of establishing a support order in joint legal custody situations," although such custodial arrangements, as we have noted, "may be considered by the court as a reason for deviating from the guidelines," especially "if physical custody is jointly shared by the parents." '
" Boatfield, 895 So.2d at 357 (quoting Comment, Rule 32, Ala. R. Jud. Admin.)."
966 So.2d at 932-33.
In the present case, the husband was not awarded sole physical custody of either *67 child; therefore, Rule 32(B)(9) is inapplicable to the calculation of his child-support obligation.
B. Alimony in Gross
The husband argues that the trial court erred in awarding the wife $125,000 as alimony in gross in the June 19, 2017, order amending the April 13, 2017, judgment because, the husband says, the trial court did not expressly state how it calculated that amount. However, we cannot consider that argument because the husband did not present it to the trial court.[6] See Andrews, supra.
Moreover, even if we could consider that argument, it would not warrant reversal of the trial court's judgment insofar as it awarded the wife $125,000 in alimony in gross because the manner in which the trial court calculated the $125,000 award of alimony in gross can be inferred from the trial court's explanation of how it calculated the $170,000 award of alimony in gross contained in the April 13, 2017, judgment. In the April 13, 2017, judgment the trial court explained that it had awarded the wife $170,000 in alimony in gross because that amount was approximately one-third of the total value of Rohling Dental Laboratories, LLC ("the dental lab"), which the trial court had determined to be approximately $509,000 based on the calculation of the dental lab's value performed by Blackburn. We can infer that the trial court awarded the wife $125,000 in alimony in gross in the June 19, 2017, order because it had decided to reduce the award to the wife from approximately one-third of the total value of the dental lab to approximately one-fourth of that total value. See Blasdel v. Blasdel, 110 So.3d 865, 871-72 (Ala. Civ. App. 2012) (inferring the manner in which a trial court had calculated the value of a spouse's interest in a closely held business from the data the trial court had stated that it had considered).
The husband next argues that the trial court erred in awarding the wife alimony in gross in the amount of $125,000 because, he says, the trial court made that award based on the total value of the dental lab, as calculated by Blackburn, *68 even though the husband owned only 90% of the dental lab. However, we cannot consider that argument because the husband did not present it to the trial court. See Andrews, supra.
The husband also argues that the trial court erred in awarding the wife $125,000 in alimony in gross because, the husband says, the trial court erroneously relied on Blackburn's calculation of the value of the dental lab, which, the husband says, was based on financial data of the dental lab that was outdated by the last day of trial and did not take into account the dental lab's financial data for 2016. However, the husband did not make available the dental lab's profit and loss statement for 2016 until he produced it during his rebuttal testimony on the last day of trial. "The burden of proving the value of marital property rests with both parties." Beck v. Beck, 142 So.3d 685, 695 (Ala. Civ. App. 2013). The wife paid Blackburn, an independent expert in the valuation of businesses who had no financial stake in the outcome of the case, $7,000 to calculate the estimated value of the dental lab before trial. Obviously, the dental lab's year-end financial data for 2016 did not exist when Blackburn performed his calculation in August 2016, shortly before the trial began on September 7, 2016, and Blackburn, in performing his calculation, relied on the dental lab's financial data for the last five full years before the trial began. If the husband wanted the trial court to consider the effect of the year-end financial data for 2016 on the value of the dental lab, he bore the burden of proving that effect. See Beck. The only evidence he offered to prove that effect was his testimony that the dental lab was "not worth much of anything."
"In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of witnesses, and the trial court should accept only that testimony it considers to be worthy of belief. Ostrander v. Ostrander, 517 So.2d 3 (Ala. Civ. App. 1987). Further, in determining the weight to be accorded to the testimony of any witness, the trial court may consider the demeanor of the witness and the witness's apparent candor or evasiveness. Ostrander, supra.... It is not the province of this court to override the trial court's observations. Brown [ v. Brown, 586 So.2d 919 (Ala. Civ. App. 1991) ]."
Woods v. Woods, 653 So.2d 312, 314 (Ala. Civ. App. 1994).
" ' "Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court ...." ' Ex parte Roberts, 796 So.2d 349, 351 (Ala. 2001) (quoting Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala. 1996) ). 'When the evidence in a case is in conflict, the trier of fact has to resolve the conflicts in the testimony, and it is not within the province of the appellate court to reweigh the testimony and substitute its own judgment for that of the trier of fact.' Delbridge v. Civil Serv. Bd. of Tuscaloosa, 481 So.2d 911, 913 (Ala. Civ. App. 1985). '[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow.' Ex parte Foley, 864 So.2d 1094, 1099 (Ala. 2003) (citations omitted)."
Ex parte R.E.C., 899 So.2d 272, 279 (Ala. 2004).
We can infer from its determination that the dental lab had a value of $509,000 that the trial court did not find credible the husband's testimony that the dental lab was "not worth much of anything." We cannot substitute our judgment for that of the trial court regarding the credibility of testimony. See R.E.C. and Woods.
*69 "This court does not expect the trial-court judges in this state to be experts in making valuations of ... business organizations ...." Blasdel v. Blasdel, 110 So.3d at 873. Moreover, this court does not expect a trial-court judge in this state to take raw financial data, such as the dental lab's profit and loss statement for 2016, and translate that raw data into a valuation of the dental lab. Because the only evidence of the value of the dental lab offered by the husband was his opinion that, despite the fact that the dental lab had provided him with gross income of $96,658.22, it was "not worth much of anything," which the trial court obviously found implausible, the husband left the trial court with no credible evidence of the value of the dental lab other than Blackburn's calculated estimate that it was worth $509,000 based on the dental lab's financial data for the last five full years before the trial commenced in September 2016. Therefore, based on the evidence that was before the trial court, we cannot hold that the trial court erred in determining that the dental lab had a value of $509,000.
The husband also argues that the trial court erred in relying on Blackburn's calculation of the value because it was performed pursuant to a "calculation engagement" rather than a "valuation engagement," as those terms are used in the Statements on Standards for Valuation Services ("the SSVS") established by the American Institute of Certified Public Accountants. In pertinent part, the SSVS states:
"There are two types of engagements to estimate value-a valuation engagement and a calculation engagement. The valuation engagement requires more procedures than does the calculation engagement. The valuation engagement results in a conclusion of value. The calculation engagement results in a calculated value. ...
"a. Valuation engagement. A valuation analyst performs a valuation engagement when (1) the engagement calls for the valuation analyst to estimate the value of a subject interest and (2) the valuation analyst estimates the value ... and is free to apply the valuation approaches and methods he or she deems appropriate in the circumstances. The valuation analyst expresses the results of the valuation as a conclusion of value; the conclusion may be either a single amount or a range.
"b. Calculation engagement. A valuation analyst performs a calculation engagement when (1) the valuation analyst and the client agree on the valuation approaches and methods the valuation analyst will use and the extent of the procedures the valuation analyst will perform in the process of calculating the value of a subject interest (these procedures will be more limited than those of a valuation engagement) and (2) the valuation analyst calculates the value in compliance with the agreement. The valuation analyst expresses the results of these procedures as a calculated value. The calculated value is expressed as a range or a single amount. A calculation engagement does not include all of the procedures required for a valuation engagement ...."
The SSVS provides that a valuation analyst may use the capitalization-of-earnings method, the method used by Blackburn in calculating the value of the dental lab, in performing a valuation engagement as well as in performing a calculation engagement. Both a calculation engagement and a valuation engagement result in an estimate of value; the valuation engagement requires the analyst to employ more procedures in *70 reaching an estimate of value than a calculation engagement does. The undisputed evidence established that Blackburn performed his calculation in accordance with the standards for a calculation engagement contained in the SSVS. Rule 702(a), Ala. R. Evid., provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."
There is no dispute that Blackburn is an expert in the field of valuing businesses. Pursuant to Rule 702(a), the trial court properly considered the fact that Blackburn had estimated the value of the dental lab pursuant to a calculation engagement rather than estimating it pursuant to a valuation engagement to be a factor bearing on the weight to be accorded Blackburn's estimate rather than a factor disqualifying Blackburn's estimate from consideration by the trial court. The trial court found that, despite the fact that Blackburn had estimated the value of the dental lab pursuant to a calculation engagement rather than estimating it pursuant to a valuation engagement, his estimate was nonetheless a reliable basis for determining the value of the dental lab. We cannot substitute our judgment for that of the trial court regarding the weight to be accorded Blackburn's estimate. See Woods.
The husband next argues that Blackburn's estimate was erroneous because, he says, it was based on an erroneous five-year-average net cash flow to equity[7] of $54,645 that Blackburn calculated based on the dental lab's financial data for the years 2011 through 2015. Blackburn testified that his analysis of the dental lab's financial data for the years 2011 through 2015 and his calculations based on that analysis indicated that an average of approximately $54,000 per year could be taken out of the dental lab without adversely affecting the dental lab's operations. Although the husband argues that that analysis and those calculations are erroneous, the husband himself testified as follows in response to a question posed by the trial court:
"Q. Okay. Now, what is your response to Mr. Blackburn's testimony that 54,000 a year could be taken from the business and you not feel it?
"A. Well, I guess in light of some of the other personal expenses he brought out, I mean, the Turtle Point [Yacht & Country Club] membership, the Court House [Racquet Club] membership, things of that nature, that affected my cash flow, obviously. I do take a little of a draw a little above my W-2 salary. So it is not to the extent of $54,000 by any means, but if you were to look back and the other numbers that I guess would typically be considered personal expenses that were run through the business it may approach that I suppose and perhaps even I guess sometimes even may have gone over which caused some of the cash shortfalls in the past."
(Emphasis added.)
Blackburn testified in detail regarding his analysis and calculations. It is undisputed that his analysis and calculations were performed in accordance with the standards for estimating value pursuant to a calculation engagement set forth in the SSVS. The question whether his calculation *71 of the five-year-average net cash flow to equity of $54,645 was accurate and reliable was a question of fact for the trial court to determine. The trial court, as the sole judge of the facts and of the credibility of the witnesses, see Woods, supra, implicitly found that that calculation was accurate and reliable, and that implicit finding is supported by the evidence. We cannot substitute our judgment for that of the trial court with respect to that question of fact. See R.E.C., supra.
C. Periodic Alimony
The husband argues that the trial court erred in awarding the wife $800 per month in periodic alimony because, he says, his net income in 2016, the last full year before the entry of the trial court's judgment, would not be sufficient to pay that periodic-alimony award plus the other financial obligations imposed on him by the trial court's judgment, as ultimately amended, plus his own living expenses. See Shewbart v. Shewbart, 64 So.3d 1080, 1088 (Ala. Civ. App. 2010) ("Once the financial need [for periodic alimony] of the petitioning spouse is established, the trial court should consider the ability of the responding spouse to meet that need.").
"[G]enerally, ... '[t]he source of periodic-alimony payments must be the current income of the payor spouse.' Rose v. Rose, 70 So.3d 429, 433 (Ala. Civ. App. 2011) (citing Smith v. Smith, 866 So.2d 588, 591 (Ala. Civ. App. 2003) ). The current income, however, is not the sole factor for the trial court to consider in determining an award of periodic alimony.
" '[W]hen determining the amount of periodic alimony to be awarded, the trial court shall consider the earning capacity of the parties. See, e.g., Ebert v. Ebert, 469 So.2d 615, 618 (Ala. Civ. App. 1985) ("[The] ability to earn, as opposed to actual earnings, is a proper factor to consider in deciding ... an initial award of ... periodic alimony ...."). As with the matter of voluntary underemployment for child-support purposes, the factual question of the earning capacity of a spouse is to be decided by the trial court as an exercise of its judicial discretion. See Lackey v. Lackey, 18 So.3d 393 (Ala. Civ. App. 2009). Hence, we may reverse a judgment based on a finding regarding the earning ability of a spouse for alimony purposes only if the trial court has exceeded its discretion in making that finding. See Warner v. Warner, 693 So.2d 487, 488-89 (Ala. Civ. App. 1997).'
" Stone v. Stone, 26 So.3d 1228, 1231 (Ala. Civ. App. 2009)."
Meehan v. Meehan, 249 So.3d 1120, 1129 (Ala. Civ. App. 2017).
The record indicates that, in 2016, the husband's net income from the wages paid him by the dental lab was $74,390.72, which is the equivalent of approximately $6,200 per month. That $6,200 per month in net wages does not include the money spent by the dental lab to pay the husband's personal expenses or the money the husband drew out of the dental lab as profit, which are also forms of income. The record does not indicate the net income the husband received in those forms in 2016. Thus, we cannot calculate his total net income for 2016, although we can conclude that it exceeded the approximately $6,200 per month in net income he received in the form of wages. However, "[t]he [husband's] current income ... [was] not the sole factor for the trial court to consider in determining an award of periodic alimony"; the trial court also had to consider his earning capacity. Meehan, 249 So.3d at 1129. The most complete information in the record regarding the husband's ability *72 to earn is the parties' joint federal income-tax return for 2013, which indicates that his net income that year was approximately $112,000, which would be approximately $9,333 per month.
According to the husband's testimony, his monthly payments on the debts he was obligated to pay pursuant to the divorce judgment, as amended, totaled approximately $1,762. According to the husband's testimony, his monthly living expenses totaled approximately $2,425. The judgment, as amended, required the husband to pay an average of $125 a month in alimony in gross in 2018, $1,138 per month in current child support, $250 per month in past-due child support, and $800 per month in periodic alimony; those obligations total $2,313 per month.[8] Thus, in order for the husband to pay all the debts and other financial obligations imposed on him by the divorce judgment, as amended, plus his personal living expenses, he would need net income of approximately $6,500 per month. As discussed above, the evidence established that the husband has the ability to earn net income of approximately $112,000 per year, which is approximately $9,333 per month. Thus, the record supports the trial court's implicit finding that the husband had the ability to earn sufficient income to pay the wife $800 per month in periodic alimony.
The husband also argues that the wife failed to prove a need for periodic alimony, see Shewbart, 64 So.3d at 1087 ("A petitioning spouse proves a need for periodic alimony by showing that without such financial support he or she will be unable to maintain the parties' former marital lifestyle."), because, he says, "[t]he wife did not submit to the [trial] court an itemization of her anticipated future expenses post-divorce." Husband's brief at 47.
"As a first step toward proving a need for periodic alimony, 'a petitioning spouse should ... establish the standard and mode of living of the parties during the marriage and the nature of the financial costs to the parties of maintaining that station in life. Shewbart[ v. Shewbart], 64 So.3d [1080] at 1088 [ (Ala. Civ. App. 2010) ]. Although submitting an itemized monthly budget may be a preferred practice, nothing in the law requires a spouse to submit such a budget to the trial court in order to meet that evidentiary burden, as the husband contends. Because of the broad discretionary power of a trial court over an award of periodic alimony, see Shewbart, 64 So.3d at 1087, a petitioning spouse need only present sufficient evidence from which the trial court can reasonably infer the costs associated with the marital standard of living. See generally Grocholski v. Grocholski, 89 So.3d 123 (Ala. Civ. App. 2011) ; 32 Am. Jur. Proof of Facts 2d 439, Spousal Support on Termination of Marriage (1982)."
McCarron v. McCarron, 168 So.3d 68, 76 (Ala. Civ. App. 2014) (emphasis added). The evidence established the following. The purchase price of the house ("the marital home")[9] that the parties and their *73 children lived in before the parties separated was $279,900. The parties' monthly mortgage payment on the marital home was $1,448.81, and their homeowners' insurance cost $343 per month. The property taxes on the marital home were $1,563 annually. The utilities for the marital home cost approximately $500 per month, the cable television cost approximately $70 per month, and Internet service cost approximately $60 per month. The termite bond on the marital home cost $372 per year, while other pest-control services cost $35 per month. The security system on the marital home cost $30 per month, and lawn-care service for the marital home cost $73 per month. During the marriage, the parties belonged to Turtle Point Yacht & Country Club ("Turtle Point") and Court House Racquet Club ("Court House"). Between January 1, 2011, and December 31, 2015, the dental lab paid an average of $5,227 per year to Turtle Point on behalf of the parties, and, during that same period, the dental lab paid Court House an average of $1,004 per year on behalf of the parties. During the marriage, the parties' youngest child attended a private school at a cost of $620 per month. The parties' joint federal income-tax return for 2013 reported total gross income in the amount of $152,483 for that year. During the marriage, the wife drove a 2010 Lincoln Navigator sport-utility vehicle, which had a monthly payment of $541.67. The insurance on that automobile cost $112 per month. Accordingly, based on the evidence before it, the trial court reasonably could have inferred, as it indeed did, that "[t]he [parties] maintained a very comfortable lifestyle while married but admittedly lived beyond their means, which resulted in considerable consumer debt and other liabilities ...." See McCarron, supra. Therefore, we find no merit in the husband's argument that the wife failed to prove the marital standard of living.
Insofar as the husband may be arguing that the wife failed to prove that she could not maintain the marital standard of living based on her own property and income, see Shewbart, 64 So.3d at 1088 (stating that, after establishing the marital standard of living, the petitioning spouse should establish his or her inability to achieve that same standard of living through the use of his or her separate estate, marital property awarded him or her, and his or her wage-earning capacity), we note that the record indicates that the wife initially worked as a legal secretary until the parties first child was born in July 2003; that, thereafter, she stayed at home to take care of the children until returning to work as a teacher's aide in 2014; that she subsequently began working as a paralegal and was still doing so when this action was tried; and that she was earning a gross salary of $1,733 per month when the trial of this action ended. In addition to her gross salary, the June 19, 2017, order provided that, if the husband elected to pay the alimony in gross in installments, he was obligated to pay the wife an average of $125 per month in alimony in gross during 2018. The trial court reasonably could have inferred that, with gross income of $1,858 ($1,733 + $125 = $1,858) per month, the wife would not be able to support the standard of living the parties had enjoyed during the marriage. Therefore, insofar as the husband might be arguing that the wife failed to prove that she could not maintain the marital standard of living based on her own property and income, we find no merit in that argument.
The husband next argues that the trial court erred in awarding the wife periodic alimony because, he says, it constitutes a *74 "double-dip" against the future excess earnings of the dental lab. However, instead of pursuing this argument to its conclusion, he deviates from his "double-dipping" argument to conclude:
"[The dental lab's] operating loss in 2016 pretermit[s] the need to investigate the details of this argument further. Suffice it to say, that with a corporate loss of $23,000.00 in 2016, there are no excess earnings and the periodic alimony which would be derived therefrom can no longer be supported. If any further proof is needed, one has merely to look at the cash flow deficiency resulting from the award."
Husband's brief at 52. Thus, what begins as a "double-dipping" argument circles back to an inability-to-pay argument, which we have already disposed of above.
D. Retirement Accounts
The husband argues that the trial court erred in awarding the wife one-half of his retirement accounts because, he says, the trial court did not determine the value of his accounts on the date he filed his complaint seeking a divorce and, therefore, erroneously included in the award to the wife appreciation in the value of his retirement accounts that had occurred subsequent to the filing of his complaint. However, we cannot consider that argument because the husband raises it for the first time on appeal. See Andrews, supra.
The husband also argues that awarding the wife one-half of his retirement accounts was inequitable when that award is considered together with the award of alimony in gross because, he says, the wife was awarded $125,000 in alimony in gross, whereas he was awarded the dental lab that is "not worth much of anything." However, for the reasons set forth above in our discussion of the award of alimony in gross, we find no merit in the husband's argument that the dental lab was "not worth much of anything." Consequently, because the premise of the husband's argument, i.e., that the dental lab was "not worth much of anything" is erroneous, we reject his argument on that basis.
E. Life Insurance
The husband argues that the trial court erred in requiring him to maintain a policy insuring his life for $1,000,000 for the benefit of the wife and the children until he discharges his financial obligations under the divorce judgment because, he says, that amount far exceeds his total financial obligations under the divorce judgment. "[T]he decision whether to require a payor spouse to obtain life insurance to benefit the recipient spouse is absolutely discretionary with the trial court." Alexander v. Alexander, 65 So.3d 958, 965 (Ala. Civ. App. 2010). The husband has not cited any legal authority that would support the proposition that the trial court acted outside its discretion in requiring him to maintain an existing policy insuring his life for $1,000,000, and, in the absence of such a citation, we decline to reverse that aspect of the trial court's judgment. See Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala. 1994) ("[I]t is not the function of [an appellate court] to do a party's legal research ....").
II. Appeal No. 2160860
The sole issue presented by this appeal is whether the trial court erred in ordering the husband or his attorneys to pay all or a portion of the fees of the wife's expert witness. In pertinent part, Rule 26(b)(5), Ala. R. Civ. P., provides:
"Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
*75 "(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify and to state the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion. (ii) Upon motion, the court may order further discovery by other means, subject to such restrictions as to scope and such provisions, pursuant to subdivision (b)(5)(C) of this rule, concerning fees and expenses as the court may deem appropriate.
"....
"(C) Unless manifest injustice would result, (i) the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under subdivision[ ] (b)(5)(A)(ii) ... of this rule; and (ii) with respect to discovery obtained under subdivision (b)(5)(A)(ii) of this rule the court may require ... the party seeking discovery to pay the other party a fair portion of the fees and expenses reasonably incurred by the latter party in obtaining facts and opinions from the expert."
(Emphasis added.)
The husband sought and obtained an order allowing him to depose Blackburn and included in the deposition notice a request for Blackburn to produce voluminous documents at his deposition. Thereafter, the husband took the deposition of Blackburn and obtained copies of the documents requested in the husband's deposition notice. The trial court ordered the husband to pay Blackburn "$1,040.00, which the Court determine[d] [wa]s a reasonable fee for time spent by Mr. Blackburn in responding to discovery propounded by the Husband to produce documents at deposition, and for time spent by Mr. Blackburn in sitting for [the] deposition noticed by the Husband." That provision of the trial court's judgment is authorized by Rule 26(b)(5), and we find no error with respect to it.
Insofar as the trial court ordered the husband or his attorneys to pay some or all of the $7,000 fee the wife had agreed to pay Blackburn for his services as an expert, we find that that provision of the trial court's judgment, as amended, is contrary to our holding in Vardaman v. Vardaman, 167 So.3d 342, 351-52 (Ala. Civ. App. 2014), that recovery of a party's expert-witness fees from the opposing party is not permitted in domestic-relations actions. Although Rule 37, Ala. R. Civ. P., authorizes a trial court to impose sanctions for a party's failure to comply with a discovery order, those sanctions may not include an order requiring the noncompliant party to pay some or all of the opposing party's expert-witness fees in a domestic-relations action. Therefore, we reverse the trial court's judgment insofar as it ordered the husband or his attorneys to pay some or all of the wife's $7,000 expert-witness fee as a discovery sanction.
Conclusion
In appeal no. 2160860, we reverse the judgment of the trial court insofar as it ordered the husband or his attorneys, as a discovery sanction, to pay some or all of the $7,000 fee the wife had agreed to pay Blackburn for calculating the value of the dental lab pursuant to a calculation engagement; affirm the judgment insofar as it ordered the husband to pay Blackburn's fees for responding to the husband's discovery requests and testifying at the deposition noticed by the husband; and remand *76 the cause for the entry of a judgment consistent with this opinion. In appeal no. 2160859, we affirm the trial court's judgment in all respects.
2160859-AFFIRMED.
Thompson, P.J., and Thomas and Donaldson, JJ., concur.
Moore, J., concurs in the result, without writing.
2160860-AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Thompson, P.J., and Thomas, Moore, and Donaldson, JJ., concur.

In addition to being a certified public accountant, Blackburn is a certified valuation analyst, which is signified by the "CVA" following his name, and a master analyst in financial forensics, which is signified by the "MAFF" following his name.

Blackburn calculated the value of $509,000 using the capitalization-of-earnings method. The "$530,080.00 BIZCOMPS Equity Value" and the "$505,710.00 Pratt Stats Equity Value" were components used to calculate the value of Rohling Dental Laboratory, LLC, pursuant to the guideline-transaction method. BIZCOMPS and Pratt's Stats are data compilations regarding the sale of businesses. The guideline-transaction-method valuation of $512,000 was calculated using a weighted average, with $530,080 being accorded 25% of the weight and $505,710 being accorded 75% of the weight. However, although Blackburn calculated the value according to the guideline-transaction method for comparison with the results of the capitalization-of-earnings method, he opined that the capitalization-of-earnings method was the most accurate method in this particular case because it was based on the individual financial data of Rohling Dental and that, therefore, he relied exclusively on the capitalization-of-earnings method in calculating that the value of the dental lab was $509,000.

According to the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants, which was introduced into evidence, a valuation analyst estimates the value of the business whether he or she performs the valuation pursuant to a calculation engagement or a valuation engagement, but the valuation engagement requires more procedures than the calculation engagement and the estimate of value resulting from a valuation performed pursuant to a valuation engagement is referred to as a "conclusion of value," whereas the estimate resulting from a valuation performed pursuant to a calculation engagement is referred to as a "calculated value."

The trial court attached to the June 19, 2017, order a CS-42 form indicating the manner in which it had calculated the husband's child-support obligation of $1,138. The CS-42 form lists the husband's adjusted gross monthly income as $8,055 and lists the wife's adjusted gross monthly income as $1,733. The sum of those two amounts is $9,788, with the husband's adjusted gross income constituting 82% of that sum and the wife's adjusted gross income constituting 18%. The monthly child-support obligation listed on the Rule 32 guidelines for two children based on a combined adjusted monthly gross income of $9,788 is $1,508. The trial court added the monthly cost of the children's health insurance, which was $545, to the $1,508 to arrive at a total child-support obligation of $2,053. The trial court calculated the husband's 82% share of that total child-support obligation to be $1,683. The trial court then deducted the $545 cost of the children's health insurance from the husband's share of the monthly child-support obligation to arrive at a monthly child-support obligation of $1,138 for the husband.
It is apparent that the trial court derived the husband's gross adjusted income of $8,055 per month by rounding off the $8,054.83 listed as the husband's gross monthly income on his CS-41 form dated February 23, 2017, which was admitted into evidence as "Husband's Exhibit 18." The husband derived the $8,054.83 listed on that CS-41 form from the W-2 form from Rohling Dental Laboratories, LLC, for the year 2016, which listed his total wages for that year as $96,658.22.
Although Rohling Dental paid the cost of the children's health insurance for the husband, the payment of that cost was not reflected as income on his W-2 form. Thus, the trial court deducted the monthly cost of that insurance from the husband's share of the monthly child-support obligation without including it in the husband's income. However, because the wife did not appeal from the trial court's judgment, as amended, the issue whether the trial court erred in deducting the cost of the children's health insurance from the husband's share of the monthly child-support obligation without including it in his gross monthly income is not before us. For the same reason, the issue whether the income resulting from Rohling Dental's payment of other personal expenses of the husband and income resulting from the husband's drawing profits from Rohling Dental, neither of which are reflected on his W-2 form, should have been included in his gross monthly income for purposes of calculating his child-support obligation is not before us.

Presumably, "$7,500" was a clerical error because the April 13, 2017, judgment had not ordered the husband or his attorneys to pay that amount.

The April 13, 2017, judgment stated how the trial court had calculated the $170,000 award of alimony in gross contained in that judgment. The June 19, 2017, order amended the April 13, 2017, judgment by, among other things, substituting an award of $125,000 in alimony in gross for the $170,000 award in the April 13, 2017, judgment. The June 19, 2017, order did not expressly state how the trial court had calculated the $125,000 award. Because the June 19, 2017, order amended the April 13, 2017, judgment and prejudiced the husband in a way that could not have been asserted in the postjudgment motion the husband had previously filed, i.e., by failing to state how it had calculated the award to the wife of $125,000 in alimony in gross, the husband could have filed a second postjudgment motion within 30 days after the entry of the June 19, 2017, order, asserting that the trial court had erred in failing to state how it had calculated the $125,000 award of alimony in gross. See, e.g., Green v. Green, 43 So.3d 1242, 1243-44 (Ala. Civ. App. 2009). As this court explained in Goodyear Tire & Rubber Co. v. Bush, 160 So.3d 787, 789-90 n.1 (Ala. Civ. App. 2014) :
"Although the Rules of Civil Procedure do not allow for successive postjudgment motions seeking the same relief, a party may file a second postjudgment motion if a court has amended a judgment to the prejudice of that party and that prejudice could not have been addressed in the original postjudgment motion. See Ex parte Dowling, 477 So.2d 400, 404 (Ala. 1985). In that event, the second postjudgment motion tolls the time for taking an appeal. See J.H.F. v. P.S.F., 835 So.2d 1024, 1026 (Ala. Civ. App. 2002)."
However, the husband failed to file such a postjudgment motion after the entry of the June 19, 2017, order and thereby failed to preserve for appeal the argument that the trial court had erred in failing to state how it calculated the award to the wife of $125,000 in alimony in gross. See Andrews, supra.

In layman's terms, the net cash flow to equity of a business is the amount of cash that could be distributed to the owners of the business after all of the business's expenses have been paid.

The husband argues that the monthly financial obligations imposed on him by the divorce judgment, as amended, included $620 for the parties' younger child's private-school tuition. Although the trial court's original judgment entered on April 13, 2017, required the husband to pay that private-school tuition, the June 19, 2017, order amending the trial court's judgment eliminated his obligation to pay that tuition. Therefore, we have not included that $620 per month in private-school tuition in calculating the monthly financial obligations imposed on the husband by the trial court's judgment, as amended.

The marital home was sold while the divorce action was pending in the trial court, and the net proceeds were divided between the parties.